IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CHRISTOPHER O'NEAL PATTERSON,    )
                                 )
              Plaintiff,         )
                                 )
       v.                        )        1:11CV138
                                 )
JASON RANDAZZO et al.,           )
                                 )
              Defendants.        )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

After Plaintiff Christopher O'Neal Patterson ("Patterson") pled guilty to multiple criminal charges stemming from a bank robbery and subsequent shootout with law enforcement in which his co-defendant was killed, he now sues those law enforcement officers for personal injuries he sustained in the melee. Before the court are two motions:  the motion by Defendant Greensboro Police Department ("GPD") officers Ernest K. Wrenn, Gerald Jones, Jason Randazzo, Justin Flynt, Kristen Bennett, and Matthew Phillip O'Hal (collectively "Defendants") to dismiss Patterson's second amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (Doc. 39), and Patterson's motion to appoint counsel (Doc. 43).[1]  For the reasons set forth below, Defendants' motion will be granted in part and denied in part,

---

[1] All citations are to the record in this civil case, unless specifically referenced otherwise to the underlying criminal case.

and Patterson's motion will be denied without prejudice.

## I.  BACKGROUND

On November 3, 2010, this court entered a judgment imposing a 744-month prison sentence against Patterson after he pled guilty to crimes arising out of two separate robberies in early 2009.  United States v. Christopher O'Neal Patterson, 1:09CR54-1 (Doc. 39) (the "criminal case").[2]  In support of the Plea Agreement in the criminal case, the Government submitted a Factual Basis document.  (Docs. 17 and 20, respectively, in case 1:09CR54-1.)  When questioned in open court during his change of plea hearing, Patterson stated he had no objection to the facts as presented in the Factual Basis.  (Doc. 22 at 26 in case 1:09CR54-1.)

After Patterson was sentenced, he commenced this civil suit.  His second amended complaint alleges through 42 U.S.C. § 1983 that Defendants used excessive force during Patterson's arrest in violation of the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.  (Doc. 35.)

---

[2] Patterson pled guilty to interference with commerce by robbery, in violation of 18 U.S.C. §§ 2, 1951(a) (2006); carry and use of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §§ 2, 924(c)(1)(A)(iii), (c)(1)(C)(i) (2006); armed bank robbery, in violation of 18 U.S.C. §§ 2, 2113(a) (2006); and carry and use of a firearm during and in relation to a crime of violence causing death, in violation of 18 U.S.C. §§ 2, 924(c)(1)(a)(iii), (c)(1)(C)(i), 924(j)(1) (2006).  Patterson's sentence was affirmed by the Fourth Circuit.  United States v. Patterson, 443 F. App'x 843 (4th Cir. 2011).

Patterson attached to his second amended complaint, and incorporates therein, what he represents to be interviews conducted by the North Carolina State Bureau of Investigation ("SBI") of some of the Defendants after the shootout (Exhibit A) and a rough transcript of the video and sound recording from the dashboard camera of one of the GPD vehicles during the chase and shootout (Exhibit B).

The second amended complaint and its attachments, taken as true for the purposes of the present motions, allege that on February 9, 2009, at about 5:15 p.m., Patterson was driving a black Infiniti car that GPD officers suspected was fleeing an armed robbery of a bank. As Patterson's vehicle eluded police, refusing to stop, the officers set out "stop sticks." (Doc. 35 at ¶ 1.) Patterson "lost control" of the vehicle, "swerved," hit Defendant O'Hal, and pinned him under the car. (Id. ¶ 2.) Patterson alleges that Defendants "willfully, maliciously, and sadistically" used excessive force by firing into his vehicle repeatedly such that they had to reload their weapons at least once. (Id. ¶ 3.) Patterson was not hit, however. (Id. ¶ 4.) Patterson exited the disabled vehicle "with his hands up" and surrendered "both physically and verbally." (Id. ¶¶ 5-6.) He fell to the ground "because of a powerful impact" to his shin while some Defendants continued to discharge their weapons. (Id. ¶ 6.) As he lay on the ground defenseless, Patterson was

3

shot again in his back right thigh, penetrating into his groin. (Id. ¶ 7.) Defendants "continued to discharge their weapons into the surrendered plaintiff's body totally disregarding plaintiff demanding to stop shooting." (Id. ¶ 8.) Patterson alleges he was shot seven times, and three additional bullets grazed him. (Id. ¶ 11.)

Attached to the second amended complaint is what Patterson represents to be an excerpt of an interview of Defendant Flynt, one of the responding GPD officers, conducted by the SBI. (Doc. 35 Ex. A.) The interview quotes Flynt as saying that during the chase he heard the officers say that they were being shot at, and Flynt himself saw the driver point a gun and shoot toward the position of Defendants O'Hal and Randazzo as well as Sergeant Cranford and another officer. (Id.) Flynt is quoted as saying:

> When I saw the driver [Patterson] aiming and shooting at the officers I began shooting at the driver in defense of the other officers['] lives. The driver got out of the car, stopped shooting and yelled 'stop f[#]cking shooting at me.' He then got down on the ground.

(Doc. 35 Ex. A.) Patterson alleges that the dashboard camera recording referenced in Exhibit B contradicts this account. (Id.) In fact, Defendant Randazzo's alleged statement to the SBI notes that Patterson "got out of the car and got on the ground with his hands up and said 'stop shooting.'" (Id.)

4

Defendant Wrenn allegedly told the SBI that Patterson "got out of the car and lay down on the ground after spinning around and falling down." (Id.) Officers then approached and handcuffed him.

Patterson claims that the dashboard camera from Defendant Wrenn's patrol car captured the events and provides evidence that he was shot excessively after he had surrendered and while lying on the ground unarmed. (Id. ¶¶ 9-10.) Patterson's purported verbatim description of the video recording from that camera quotes officers as saying the following about him: "when the driver came up, [] I just shot at him"; "as soon as I saw him stand up I just started shooting"; and "when I saw him stand up, I just started shooting at him and he went straight down." (Id. Ex. B at 9.)

Defendants move to dismiss on the following grounds: 1) Patterson cannot state a valid claim under the Eighth Amendment because no criminal prosecution had been initiated against him at the time of the alleged use of excessive force; 2) Patterson cannot state a valid Fourteenth Amendment substantive due-process claim because the Supreme Court has stated that claims of excessive force during arrest are in the purview of the Fourth Amendment rather than substantive due process; 3) Defendants cannot be liable in their official capacity because Patterson has not alleged that they were acting pursuant to any

5

unconstitutional GPD policy; 4) Defendants are entitled to qualified immunity; 5) Patterson's second amended complaint fails to allege facts that allow the court to draw the plausible inference that his civil rights were violated; and, 6) Patterson is precluded from re-litigating the facts presented in the Plea Agreement and Factual Basis in the criminal case. Each contention will be addressed in turn. As a preliminary matter, however, the court must consider Patterson's motion for appointment of counsel.

## II. ANALYSIS

### A. Motion to Appoint Counsel

Patterson first moved for appointment of counsel pursuant to 28 U.S.C. § 1915(e)(1) on May 3, 2011. (Doc. 10.) The United States Magistrate Judge denied his motion after considering the relevant factors, including "(1) the plaintiff's financial ability to retain an attorney; (2) the efforts of the plaintiff to retain counsel; and (3) the merits of the case," along with whether the plaintiff is capable of representing himself. (Doc. 14.) The Magistrate Judge found that Patterson was capable of representing himself in this case and that it was not apparent that his claim was colorable. (Id.) Patterson has since moved four more times for appointment of counsel (Docs. 16, 19, 25, 43), the first three having been denied by United

6

States Magistrate Judges for reasons identical to the original denial. (Docs. 17, 22, 38.)

A district court may appoint counsel to an indigent plaintiff in a civil action, but there is no constitutional right to such counsel. 28 U.S.C. § 1915(e)(1). The court's discretion to appoint counsel should be exercised only in "exceptional cases." Cook v. Bounds, 518 F.2d 779, 780 (4th Cir. 1975). "Whether the circumstances are exceptional depends on 'the type and complexity of the case, and the abilities of the individuals bringing it.'" Lowery v. Bennett, 492 F. App'x 405, 411 (4th Cir. 2012) (quoting Whisenant v. Yuam, 739 F.2d 160, 163 (4th Cir. 1984), abrogated on other grounds by Mallard v. U.S. Dist. Court for the S. Dist. of Iowa, 490 U.S. 296 (1989)). Where a *pro se* litigant has a "colorable claim but lacks the capacity to present it, the district court should appoint counsel." Whisenant, 739 F.2d at 163.

Patterson has not demonstrated that this is an exceptional case or that he lacks the ability to present it. At least at this stage there are no particularly complex issues, as (for the reasons noted below) the inquiry will focus on the conduct of Patterson and the Defendants after the car chase ended. Patterson contends that his claim that Defendants used excessive force by continuing to fire upon him after he surrendered is demonstrated by a videotape from the dashboard camera of

7

Defendants' vehicles - which presumably can be produced but has not been made a part of the record in this case.    Moreover, Patterson's submissions show that he is capable of representing himself in this matter.    His filings are articulate, coherent, and comprehensive, and he has access to case law, as demonstrated by his citation to relevant legal authorities. While his confinement may limit his options in obtaining certain discovery, such as depositions, he has not demonstrated that he is unable to pursue his claims without it.    Indeed, written discovery has not yet begun, and as a result of this court's decision on the motion to dismiss, Patterson will now be free to serve discovery requests.    Thus, he will be given the opportunity to demonstrate factual support for his claim. <u>See, e.g.</u>, <u>Reeves. v. Ransom</u>, No. 1:10CV56, 2011 WL 4549144, at *8 (M.D.N.C. Sep. 29, 2011) ("[Defendant's] inability to afford counsel and the effect of his imprisonment on his ability to litigate his case are insufficiently 'exceptional' to merit appointment of counsel. . . . 'Almost every prisoner bringing a § 1983 claim would be able to cite the same circumstances as plaintiff here, and so the Court can hardly consider these circumstances to be exceptional.'" (quoting <u>Joe v. Funderburk</u>, No. 8:06-119-GRA-BHH, 2006 WL 2707011, at *1 (D.S.C. Sept. 18, 2006)); <u>Smith v. Berlin</u>, No. 3:12-cv-7358, 2013 WL 3929777, at *1 (S.D. W. Va. July 29, 2013) (finding that plaintiff's

8

inability to conduct depositions on account of his incarceration did not merit appointment of counsel); <u>Louis v. Martinez</u>, No. 5:08CV151, 2010 WL 1484302, at *1 (N.D. W. Va. Apr. 12, 2010) (denying motion to appoint counsel and finding no exceptional circumstances where plaintiff, who had survived a motion for summary judgment on a § 1983 claim, was in continuous lock-down with only four hours per month to conduct legal research and had no chance to conduct meaningful discovery).

Therefore, Patterson's motion for the appointment of counsel is denied at this time without prejudice to it being raised later upon an adequate showing.

**B.    Motion to Dismiss**

**1.    Collateral Estoppel**

Defendants argue that Patterson is estopped from asserting his § 1983 claims because he agreed to the facts contained in the Plea Agreement and Factual Basis in the criminal case and is now barred by the doctrine of collateral estoppel from re-litigating them.    Patterson argues that the facts set forth in the Factual Basis do not preclude his excessive force claims.

"Collateral estoppel or issue preclusion is premised on the notion that a judgment in a prior suit 'precludes relitigation of issues actually litigated and necessary to the outcome of the first action.'"    <u>United States v. Wight</u>, 839 F.2d 193, 196 (4th Cir. 1987) (quoting <u>Parklane Hosiery Co. v. Shore</u>, 439 U.S. 322,

326 n.5 (1979)). The doctrine may apply where a party seeks to contest an issue conceded through a plea agreement in a subsequent civil proceeding. Id. However, in order for collateral estoppel to apply, the issue contested in the second proceeding must have been "necessary and essential" to the court's determination in the first case. Id. In Wight, the Fourth Circuit determined that the defendant was not estopped from disputing the amount of his liability by his plea of guilty to a charge of using his official status to bring goods into India in violation of 18 U.S.C. § 201(g). Id. at 195–96. The plea agreement stated that Wight accepted gratuities in return for smuggling the goods, but it did not include an amount. Id. at 196. Therefore, the Fourth Circuit concluded that Wight was not collaterally estopped from disputing the amount of his liability in a second proceeding. Id.

In his Plea Agreement in the criminal case, Patterson admitted the elements of the offenses of armed bank robbery and carrying and using a firearm, by brandishing and discharging, causing the death of a person. (Doc. 17 in case 1:09cr54-1.) He also did not object[3] to the Government's Factual Basis filed

---

[3] Patterson refused to agree with the Factual Basis, but only said he did not object to the facts laid out in it. (Doc. 22 in case 1:09cr54-1 at 25, 26.)

10

by the Assistant United States Attorney. The Factual Basis provided in relevant part:

On February 9, 2009, at approximately 5:05 p.m. two black males entered the Wachovia Bank, a federally insured institution, located at 3608 High Point Road, Greensboro, North Carolina. Each brandished a weapon. One suspect began yelling "Everyone get down on the ground. I will blow everyone's head off. I'm not playing with y'all. Give me the money." The second suspect jumped the counter and demanded that one teller open her drawer. The suspect became agitated that the drawer was locked, and waved the gun around frantically. Another teller gave the suspect her drawer which he emptied into a white bag. The suspect turned back to the first teller who was able to unlock her drawer. The suspect moved the teller out of the way and grabbed the drawer and emptied its contents into the white bag. The first suspect stayed in the lobby area demanding money from the receptionist, who indicated that she did not have money. The suspects then fled with $4831.00 of money belonging to Wachovia Bank. A witness who had been inside the bank called police communications saying he was following the suspects who were driving a black Ford Taurus. As officers arrived, the witness indicated that he did not drive all the way to the end of the deadend road because he feared for his safety, but that he saw a black Infinity come up the road and he recognized the persons inside as the robbers. Officers began following a black Infinity and a high speed vehicle pursuit ensued. During the incident one citizen's car was hit by the suspect vehicle and sustained property damage. The citizen was not injured. Citizens reported seeing shots fired from the fleeing vehicle.

During the chase, both the driver and passenger in the getaway car fired at officers. Officer O'Hal, with the Greensboro Police Department attempted to place stop sticks in the area where the suspect car was traveling. The suspect's car swerved and came back toward the officer, hitting him with their vehicle. According to Officer O'Hal, the suspect car accelerated and came straight towards him. The driver of the suspect car was seen pointing a firearm at Officer O'Hal. The officer was shot and seriously

11

injured. Officers began firing at the suspect vehicle. The passenger, later identified as Dimarkchrisy Eddie Majors was shot and killed. *The driver, identified as Christopher O'Neal Patterson, continued firing, but eventually got down on the ground and dropped his gun. Patterson was shot several times during this confrontation.*

After the shooting ended, officers responded to the passenger side of the car and removed a black revolver from the passenger's hand. Mr. Majors' finger was still on the trigger. This firearm was determined to be Smith & Wesson .38 Special caliber revolver, model 10-5, serial number D214000. A silver revolver was located near the driver. It was determined to be a an Arminius .32 S&W caliber revolver, model HW5T, serial number partially obliterated.

(Doc. 20 in case 1:09CR54-1 at 3-4 (emphasis added).) Neither the Plea Agreement nor the Factual Basis addresses Patterson's actions after he went to the ground and dropped his gun.

Even reading the Factual Basis as ordering Patterson's conduct as exiting the vehicle, dropping to the ground, and then dropping his gun, however, these events were not necessary and essential to his guilty plea because they did not relate to an essential element of the offenses of conviction. Moreover, they do not necessarily contradict Patterson's claim that he surrendered when he exited the vehicle or that he was shot again after he lay on the ground.

In his second amended complaint, Patterson does not deny the conduct in the Factual Basis and Plea Agreement that relates to the elements of his offenses of conviction. Rather, he alleges misconduct by Defendants that occurred after he says he

12

surrendered.  Like in <u>Wight</u>, "the application of collateral estoppel does not extend beyond the determination of liability [for the crimes committed]."  <u>Id.</u> at 195.  The court finds, therefore, that Patterson is not collaterally estopped from asserting his § 1983 claims.[4]

### 2. Patterson's Eighth Amendment and Fourteenth Amendment Claims

Patterson's second amended complaint alleges that Defendants used excessive force during his arrest, shooting him after he had surrendered and dropped his weapon, in violation of the Fourth, Eighth, and Fourteenth Amendments.  Defendants are

---

[4] Defendants have not raised, and the court therefore does not decide, whether judicial estoppel bars Patterson's claims.  "Judicial estoppel precludes a party from adopting a position that is inconsistent with a stance taken in prior litigation.  The purpose of the doctrine is to prevent a party from playing fast and loose with the courts, and to protect the essential integrity of the judicial process."  <u>Lowery v. Stovall</u>, 92 F.3d 219, 223 (4th Cir. 1996).  Judicial estoppel has three elements.  "First, the party sought to be estopped must be seeking to adopt a position [of fact] that is inconsistent with a stance taken in prior litigation."  <u>Id.</u> at 224.  Next, the prior court must have accepted the initial factual contention.  <u>Id.</u>  "Finally, the party sought to be estopped must have 'intentionally misled the court to gain unfair advantage.'"  <u>Id.</u> (quoting <u>Tenneco Chem., Inc. v. William T. Burnett & Co., Inc.</u>, 691 F.2d 658, 665 (4th Cir. 1982)).  A Factual Basis submitted by the Government in connection with a plea agreement in a criminal case can qualify as a prior inconsistent position for the purposes of judicial estoppel.  <u>See</u> <u>Dorsey v. Ruth</u>, 222 F. Supp. 2d 753, 755–56 (D. Md. 2002).  Defendants do not argue, and the court does not therefore reach, whether Patterson is judicially estopped from contradicting facts in the Factual Basis to which he did not *object* and which were not material to the elements of the offenses of conviction.  Moreover, Defendants have not raised, so the court has not considered, any argument pertaining to any factual statement in Patterson's Presentence Report, the contents of which the court adopted as findings of fact in the criminal case.  (Doc. 45 in case 1:09cr54-1 at 10.)

13

correct that Patterson cannot assert an Eighth Amendment claim because the Cruel and Unusual Punishments Clause applies "'only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions.'" Whitley v. Albers, 475 U.S. 312, 318 (1986) (quoting Ingraham v. Wright, 430 U.S. 651, 671 n.40 (1977)). Because Patterson was in the process of being arrested at the time of the events in question, the Eighth Amendment does not apply to his claim. Therefore, Defendants' motion to dismiss Patterson's Eighth Amendment claim will be granted.

In addition, Patterson alleges a violation of the Fourteenth Amendment. It is unclear whether the second amended complaint refers to the Fourteenth Amendment to the extent that it incorporates the Fourth Amendment to the States, see Wolf v. Colorado, 338 U.S. 25 (1949), or whether Patterson asserts a freestanding substantive due process claim. Any substantive due process claim would be barred by the Supreme Court's decision in Graham v. Connor, 490 U.S. 386, 395 (1989), which held that all claims for use of excessive force during an arrest should be analyzed under the Fourth Amendment and its "reasonableness" standard rather than substantive due process. Therefore, Defendants' motion to dismiss any substantive due process claim in the second amended complaint will be granted.

14

### 3. Claims against Defendants in their Official Capacities

Patterson has alleged claims against Defendants both in their official and individual capacities. Defendants argue that they cannot be held liable in their official capacities because Patterson has not alleged that any policy or custom of the GPD played a part in the violation of his rights. They are correct. Because the governmental entity is the real party in interest in an official-capacity action, "the entity's policy or custom must have played a part in the violation of federal law." <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985) (internal quotation marks omitted). No plausible reading of Patterson's second amended complaint implicates any policy of the GPD. Therefore, Patterson may only proceed against the officers in their individual capacities, and Defendants' motion to dismiss claims against them in their official capacities will be granted.

### 4. Sufficiency of Patterson's Excessive Force Claim

Defendants argue that Patterson has not alleged sufficient facts to allow the court to draw the plausible inference that Defendants committed a violation of federal law. Under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S.

15

544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557).

Here, Patterson has alleged a plausible excessive force claim. He alleges that some Defendants continued to shoot him after he surrendered and lay on the ground in a vulnerable position. (Doc. 35 ¶¶ 9-10.) Drawing reasonable inferences in favor of Patterson, as required at the Rule 12(b)(6) stage, these facts are sufficient to make a claim that Defendants violated the Fourth Amendment plausible. See Brockington v. Boykins, 637 F.3d 503, 507 (4th Cir. 2011). Factual disputes are not resolved in the process of deciding a motion to dismiss. At this stage, Patterson has pled sufficient facts to support his excessive force claim, and Defendants' motion to dismiss for failure to state a claim will be denied.

### 5. Qualified Immunity

Defendants next argue that the individual-capacity claims should be dismissed because Defendants enjoy qualified immunity. According to Defendants, Patterson's allegations (as well as matters of which the court should take judicial notice) demonstrate that Defendants properly used deadly force "until

16

they believed the Plaintiff was no longer a threat." (Doc. 40 at 10.)

This court may grant a motion to dismiss "when the face of the complaint clearly reveals the existence of a meritorious affirmative defense." Brooks v. City of Winston-Salem, 85 F.3d 178, 181 (4th Cir. 1996). Qualified immunity is one such defense. Brockington, 637 F.3d at 507. "Officials will receive immunity unless the § 1983 claim satisfies a two-prong test: (1) the allegations, if true, substantiate a violation of a federal statutory or constitutional right and (2) the right was 'clearly established' such that a reasonable person would have known his acts or omissions violated that right." Id. at 506 (quoting Ridpath v. Bd. of Governors of Marshall Univ., 447 F.3d 292, 306 (4th Cir. 2006)).

In excessive force cases, the applicable inquiry is whether the officers' actions were "objectively reasonable." Id. (citing Graham, 490 U.S. at 390, 397). Because officers are often forced to make split-second decisions, their conduct should not be judged with the benefit of hindsight; rather, the incident should be judged from the perspective of a reasonable officer at the scene at the time of the arrest. Graham, 490 U.S. at 396; Brockington, 637 F.3d at 506-07. The reasonableness test involves balancing the nature and quality of the intrusion on the individual's Fourth Amendment interests

against "'the countervailing governmental interests at stake.'" Brockington, 637 F.3d at 506 (quoting Turmon v. Jordan, 405 F.3d 202, 207 (4th Cir. 2005)). The nature of the constitutional intrusion is generally measured by the amount of force employed to effect the seizure as well as the plaintiff's injuries. Id. Among the factors considered in determining the governmental interests are the severity of the crime, whether the suspect posed an immediate threat to the safety of others, and whether he actively attempted to evade arrest by flight. Id.; Turmon, 405 F.3d at 207.

An officer may use deadly force when he has sound reason to believe a suspect poses a threat of serious physical harm to the officers or others. Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996). However, "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." Waterman v. Batton, 393 F.3d 471, 481 (4th Cir. 2005). Nevertheless, "a mistaken understanding of the facts that is reasonable in the circumstances can render a seizure based on that understanding reasonable under the Fourth Amendment." Milstead v. Kibler, 243 F.3d 157, 165 (4th Cir. 2001). "[W]hile a totality of circumstances analysis still remains good law, if events occur in a series they may be analyzed as such." Brockington, 637 F.3d at 507.

18

The facts of Brockington are instructive. There, after the plaintiff had committed his initial crimes, he confronted the defendant officer on the backyard steps of a vacant house. The officer fired his handgun at least twice at the unarmed plaintiff, who was four feet away. The first shot hit the plaintiff's hand, and the second hit his abdomen, forcing him off the stairs onto the cement landing. While the plaintiff lay on his back, unable to get up, and unable to defend himself, the officer allegedly shot him at least six times at close range. The plaintiff was rendered a paraplegic. The officer argued that he believed that his life was in danger when he fired all of his shots. Id. The Fourth Circuit affirmed the district court's finding that, for the purpose of the defendant's 12(b)(6) motion, the complaint alleged unreasonable conduct. The Court found that, "drawing all reasonable inferences in favor of [the plaintiff], he was unarmed. Rather than shoot [the plaintiff] as he lay helpless on the ground, a reasonable police officer would have asked him to surrender, called for backup or an ambulance, or retreated, depending on the facts that emerge through discovery." Id.

Here, Patterson alleges that, following the bank robbery, he drove the getaway vehicle, eluded police as he refused to pull over, and required law enforcement to disable the vehicle with stop sticks. (Doc. 35 ¶ 1.) The current complaint and its

19

attachments reveal that during the chase, Patterson shot at officers from his fleeing vehicle. His vehicle then struck Defendant O'Hal even as Defendants continued to shoot at it. (Id. ¶ 2.)

Reasonable officers were entitled to use deadly force against a driver of a fleeing vehicle who was suspected of having committed an armed robbery and who was himself firing at police. Indeed, here the vehicle was driven into O'Hal, one of the officers. Even if this collision was not intentional (as Patterson alleges), a reasonable officer could regard it as part of Patterson's attempted deadly assault under the circumstances. Thus, as a matter of law the officers' force was justified at the outset and to this extent.

Patterson alleges further, however, that after his vehicle was disabled he exited it "with his hands up" and "surrendered both physically and verbally" but that some Defendants continued to shoot at him, striking him at least six times. (Id. ¶¶ 6–10.) He alleges that he fell to the ground and, while he lay there unarmed and having surrendered, was shot again. (Id. ¶ 7.) The gunshots caused serious and permanent injuries. (Id. ¶ 11.)

What is not clear on this record is the nature and timing of Patterson's alleged surrender. To be sure, a reasonable officer would not have continued to shoot Patterson once it had

20

become clear that he had surrendered and was disarmed. Whether a reasonable officer could have concluded that Patterson had not surrendered and continued to pose a threat when he exited the vehicle, or when he fell to the ground, is not apparent on this record.[5] Thus, taking Patterson's allegations in the light most favorable to him, as the court must at this stage of the proceedings, and acknowledging the deference due the decision-making of the officers under what was a difficult situation, the court concludes that Patterson has alleged facts that, if true, would substantiate a violation of his Fourth Amendment rights.

Defendants do not argue that the violation of law alleged by Patterson was not clearly established, and in fact Brockington makes clear that such an argument would fail. "Indeed, it is just common sense that continuing to shoot someone who is already incapacitated is not justified under these circumstances." Brockington, 637 F.3d at 508. Even though deadly force was justified at the beginning of the encounter, its continued use would be unreasonable if the danger had passed. Waterman, 393 F.3d at 481–82.

---

[5] Defendants rely on their contention that Patterson was armed as he exited the vehicle and dropped his handgun only after he was on the ground. See Doc. 40 at 13 (noting that Patterson "eventually got down on the ground, and dropped his gun" before the shooting ended). The court can find no factual basis for this statement in the second amended complaint, its attachments, or any portion of the Factual Basis that was necessary to the essential elements of the offenses of conviction.

Defendants' motion to dismiss based on qualified immunity
will therefore be denied, and the excessive force claim will be
allowed to proceed to the extent Patterson alleges that
Defendants continued to shoot him after it became clear that he
had surrendered, remained subdued and unarmed, and no longer
posed a threat.   The motion will be granted in all other
respects, because the allegations of the second amended
complaint make clear that prior to that time Patterson and his
accomplice were engaged in a shootout with police, posed an
immediate threat to the officers, and were actively evading
arrest.   Any use of deadly force by the officers while the
threat was ongoing was unquestionably reasonable, and the
officers are therefore entitled to qualified immunity until the
immediate threat had ended.

## III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that Defendants' motion to dismiss
(Doc. 39) is GRANTED as to Patterson's Eighth Amendment claim,
his Fourteenth Amendment substantive due process claim, and all
claims against Defendants in their official capacities.   These
claims shall be DISMISSED.

IT IS FURTHER ORDERED that Defendants' motion to dismiss
Patterson's Fourth Amendment excessive force claim against
Defendants in their individual capacities (Doc. 39) is GRANTED

as to all claims predicted on conduct that precedes the time Patterson surrendered, remained subdued and unarmed, and no longer posed a threat; in all other respects, the motion is DENIED without prejudice to it being raised upon a further showing.

IT IS FURTHER ORDERED that Patterson's motion to appoint counsel (Doc. 43) is DENIED without prejudice.


                                    /s/   Thomas D. Schroeder
                              United States District Judge

September 30, 2013