IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| CHRISTOPHER O'NEAL PATTERSON,<br><br>Plaintiff,<br><br>v.<br><br>JASON RANDAZZO, GERALD JONES, JUSTIN FLYNT, MATTHEW PHILLIP O'HAL, JOEL CRANFORD, ERNEST K. WRENN, and KRISTEN BENNETT,<br><br>Defendants. | 1:11CV138 |

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the court on the motion of Defendants Greensboro Police Department ("GPD") Officers Ernest K. Wrenn, Gerald Jones, Jason Randazzo, Justin Flynt, Kristen Bennett and Matthew Phillip O'Hal (collectively "Defendants") for summary judgment. (Docket Entry 95). Plaintiff Christopher O'Neal Patterson ("Plaintiff" or "Patterson") has filed a response. (Docket Entry 117.) Also pending is Defendants' Motion to Dismiss. (Docket Entry 82). For the reasons that follow, Defendants' motion for summary judgment should be granted and Defendants' motion to dismiss should be denied as moot.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In November 2010, Plaintiff pled guilty to multiple criminal charges stemming from a bank robbery and subsequent shootout with law enforcement in which his co-defendant was

killed. Plaintiff was sentenced by the Honorable Thomas D. Schroeder to a 744-month prison sentence. (*See United States v. Christopher O'Neal Patterson*, No. 1:09CR54-1, Docket Entry 39) (the "criminal case").

Plaintiff, acting *pro se*, subsequently filed this civil suit against the seven Greensboro Police Department officers involved in the shootout. In his second amended complaint, Plaintiff alleged that Defendants used excessive force during his arrest in violation of the Fourth, Eighth, and Fourteenth Amendments to the Constitution. (Docket Entry 35.) Patterson challenged the entirety of GPD's use of force on the day of the shootout. (*Id.*)

On July 26, 2012, Defendants moved to dismiss the amended complaint on several grounds, including qualified immunity. (Docket Entry 39.) By order dated September 30, 2013, the Court granted Defendants' motion as to Plaintiff's Eighth Amendment claim, his Fourteenth Amendment substantive due process claim, and all claims against Defendants in their official capacities. (Docket Entry 54.) The Court further granted Defendants' motion to dismiss Plaintiff's Fourth Amendment excessive force claim against Defendants in their individual capacities as to all claims predicated on conduct that precedes the time that Plaintiff surrendered, remained subdued and unarmed, and no longer posed a threat, but denied the motion "in all other respects . . . without prejudice to it being raised upon a further showing." (*Id.* at 23.) Thus, the only remaining claim is one portion of Plaintiff's Fourth Amendment claim brought under 42 U.S.C. § 1983, against Defendants in their individual capacities.

In the second amended complaint and its attachments, Plaintiff alleged that on February 9, 2009, at about 5:15 pm he was driving a black Infiniti vehicle which GPD officers suspected was fleeing a bank robbery. (Am. Compl. ¶ 1, Docket Entry 35.) When Plaintiff's

vehicle did not stop for law enforcement, police set out "stop sticks." (*Id.*) Plaintiff alleged that he "lost control" of the vehicle, "swerved," and hit Defendant O'Hal, pinning the officer under the car. (*Id.* ¶ 2.) Plaintiff alleged that Defendants "willfully, maliciously, and sadistically" used excessive force by firing into his vehicle repeatedly such that they had to reload their weapons. (*Id.* ¶ 3.) Plaintiff alleged that he was not hit in the gunfire (which he alleged lasted "several minutes"), but that he exited the vehicle "with his hands up" and surrendered, "both physically and verbally." (*Id.* ¶¶ 4-6.) Plaintiff alleged that Defendants shot him at least seven times while he was lying on the ground, totally disregarding Plaintiff's demands that the officers "stop shooting." (*Id.* ¶¶ 8, 11.) Plaintiff was shot several times. He alleged that he sustained severe injuries, necessitating several surgeries and resulting in permanent impairment. (*Id.* ¶ 11.)

Plaintiff pled guilty to the underlying bank robbery which led to the police chase and shootout described in the amended complaint. The factual basis for Plaintiff's guilty plea, which at the time of sentencing he agreed was accurate, stated:

> A witness who had been inside the bank called police communications saying he was following the suspects who were driving a black Ford Taurus. As officers arrived, the witness indicated that he did not drive all the way to the end of the deadend road because he feared for his safety, but that he saw a black Infinity come up the road and he recognized the persons inside as the robbers. Officers began following a black Infinity and a high speed vehicle pursuit ensued. During the incident one citizen's car was hit by the suspect vehicle and sustained property damage. The citizen was not injured. Citizens reported seeing shots fired from the fleeing vehicle.
>
> During the chase, both the driver and passenger in the getaway car fired at officers. Officer O'Hal, with the Greensboro Police Department[, ]attempted to place stop sticks in the area where the suspect car was traveling. The suspect's

3

> car swerved and came back toward the officer, hitting him with their vehicle. According to Officer O'Hal, the suspect car accelerated and came straight towards him. The driver of the suspect car was seen pointing a firearm at Officer O'Hal. The officer was shot and seriously injured. Officers began firing at the suspect vehicle. The passenger, later identified as Dimarkchrisy Eddie Majors was shot and killed. The driver, identified as Christopher O'Neal Patterson, continued firing, but eventually got down on the ground and dropped his gun. Patterson was shot several times during this confrontation.

(Crim. Case, Docket Entry 20 at 4.) Thus, Plaintiff admitted under oath that after hitting an officer with the escape vehicle he fired a weapon at the officers attempting to apprehend him.

Plaintiff attached to the amended complaint what he represents to be an excerpt of an interview of Defendant Flynt, one of the responding GPD officers, conducted by the SBI. (Sec. Am. Compl. Ex. A, Docket Entry 35.) The interview quotes Officer Flynt as saying that during the chase he heard officers say that they were being shot at, and Flynt himself saw the driver point a gun and shoot toward the position of Defendants O'Hal and Randazzo as well as Defendant Cranford and another officer. (*Id.*) Officer Flynt is quoted as saying:

> When I saw the driver [Patterson] aiming and shooting at the officers I began shooting at the driver in defense of the other officers['] lives. The driver got out of the car, stopped shooting and yelled 'stop f[#]cking shooting at me.' He then got down on the ground.

(*Id.*) Defendant Randazzo's alleged statement to the SBI notes that "Patterson got out of the car and got on the ground with his hands up and said 'stop shooting.'" (*Id.*) Defendant Wrenn allegedly told the SBI that Patterson "got out of the car and la[id] down on the

4

ground after spinning around and falling down." (*Id.*) Plaintiff was then approached by officers and handcuffed. (*Id.*)

One of the GPD vehicles at the scene had a dashboard camera that recorded the scene and some of the encounter between Plaintiff and law enforcement. (*See* Decl. of Ernest Wrenn ¶ 7, Exhibit A, Docket Entry 103.) Plaintiff alleges that the dashboard camera recording referenced in Exhibit B contradicts Defendant Flynt's account and provides evidence that he was shot excessively after he had surrendered and was lying on the ground unarmed. (Docket Entry 54 at 5; *see also* Sec. Am. Compl. ¶ 9, Docket Entry 35.) The Court has viewed the dashcam video in its entirety and will address it more fully later in the discussion.

In support of their motion for summary judgment, Defendants have each filed declarations as to the events of February 9, 2009, including the robbery, high speed chase, shootout and arrest of Plaintiff. Four of the Defendants, Officers Jones, Cranford, Wrenn and Bennett, all state in their declarations that they did not engage Plaintiff during the terminal moments of the encounter. (Decl. of Gerald Jones ¶ 10, Docket Entry 99; Decl. of Joel Cranford ¶ 9, Docket Entry 102; Wrenn Decl. ¶¶ 11-12; Decl. of Kristen Bennett ¶ 10, Docket Entry 100.) The other three Defendants, Officers Randazzo, O'Hal and Flynt, were involved in the terminal moments of the encounter. Defendant O'Hal states that Plaintiff was shooting at him both before and after he exited the vehicle. (Decl. of Matthew O'Hal ¶ 11, Docket Entry 98.) Officer O'Hal further stated:

> 12. When he exited the car, it appeared that Mr. Patterson attempted to stand up, but instead of standing straight, he crouched and then went to his knees. While he was crouching and on his knees, Mr. Patterson kept the

5

> handgun aimed in my direction. I continued to engage Mr. Patterson because of my fear for my own safety.
>
> 13. At no time did I see Mr. Patterson stand up, raise his arms, or take any other physical act that could be construed as an attempt to surrender.
>
> 14. During the encounter, I did not hear Mr. Patterson say anything, including any statement that could be construed as an attempt to surrender.
>
> 15. By this time, Officer Randazzo had approached my location, and took position over my shoulder.
>
> 16. Subsequently, Mr. Patterson began to fall to the ground. After Mr. Patterson went to the ground, his arm was extended away from his body and it did not appear that he was aiming the handgun in my direction, or at any other officers or civilians at the scene. I adjudged that the threat presented by Mr. Patterson had ended and at that moment I ceased firing my service weapon. I do not recall seeing or hearing any officers at the scene fire their weapons after the point in time that Mr. Patterson no longer presented a threat to my safety.

(*Id.* ¶¶ 12-16.) Officer Flynt similarly described the terminal moments of the encounter with Plaintiff:

> Mr. Patterson's motion after he exited the suspect vehicle was towards the rear of the suspect vehicle. Although his arm began to move up and down by a few inches, Mr. Patterson continued to aim his handgun at Officers O'Hal and Randazzo's position. He continued to do so until the time that Mr. Patterson's whole body, including his arms, came to rest on the ground. At this time, I adjudged the threat presented by Mr. Patterson to have ended, and I immediately ceased firing. I do not recall seeing or hearing any other officers firing their weapons after the point in time that I adjudged Mr. Patterson's threat to have ended because the handgun was no longer aimed at other officers.

(Decl. of Justin Flynt ¶ 13, Docket Entry 101.) Officer Randazzo's declaration relates the same series of events, noting that "[o]nce Mr. Patterson went to the ground and was not aiming his handgun at anyone, I adjudged the threat to have ended, and I immediately ceased firing my service weapon." (Decl. of Jason Randazzo ¶ 13, Docket Entry 97.)

6

Defendants served a series of interrogatories on Plaintiff, asking him to "[s]tate with particularity the action taken by [each officer] on 9 February 2009 of which you are complaining and the evidence you have of that action." (*See* Defs.' Br., Ex. A, Interrogs. Nos. 5-11, Docket Entry 96-1.) Plaintiff served a single response to the seven interrogatories, stating: "[P]rior to the shooting, plaintiff knew not any defendants by name. [S]econd, plaintiff knew not where shots were coming from for he also never faced defendants. [L]astly all defendants admitted to being directly involved with the shooting and at this time that determination [redacted by Plaintiff] cannot be made." (*Id.* Ex. B, Docket Entry 96-2.)

Plaintiff has submitted various documents. One document, entitled "Affidavit of Truth," contains Plaintiff's statement regarding the events of the day in question. In pertinent part, Plaintiff states:

> 11. I then egressed the vehicle while shots were still being fired, leaving the gun in the driver's seat. I was too terrified to look in the direction of where the bullets were coming but knew they were coming from behind me.
>
> 12. I was unarmed when I egressed the vehicle. I threw my hands up and yelled for police to stop shooting. I took approximately two to three steps five at the most. I felt a powerful impact slam into my left tibia knocking me to the ground[.] I went straight to my knees and felt numerous warm projectiles invade my upper back, arm and mid torso.
>
> 13. While I lay on the ground facing away from defendants[,] hands stretched out in front of me blood dripping in my eye from a graze to the face, head in the grass waiting for death to call, I felt a warm, sensational and powerful impact penetrate my right [redacted] thigh traveling up my thigh causing my whole lower body to become warm. The impact caused me to with both hands rip grass out of the ground. At this time all firing ceased.

(Pl.'s Aff. ¶¶ 11-13, Docket Entry 115.)

7

## II. STANDARD OF REVIEW

Summary judgment is warranted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997). The party seeking summary judgment bears the burden of initially coming forward and demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate the presence of a genuine issue of material fact which requires trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When making a summary judgment determination, the court must view the evidence and justifiable inferences from the evidence in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913. However, the party opposing summary judgment may not rest on mere allegations or denials, and the court need not consider "unsupported assertions" or "self-serving opinions without objective corroboration." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

## III. DISCUSSION

### A. Excessive Force and Qualified Immunity

A Fourth Amendment claim that a police officer employed excessive force must be analyzed under an "objective reasonableness" standard. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). "The officer's actions do not amount to excessive force if they are objectively reasonable in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." *Smith v. Ray*, 781 F.3d 95, 101 (citing *Graham*

*v. Connor*, 490 U.S. 386, 397 (1989)). In considering the reasonableness of an officer's actions, the court examines the facts at the moment that the challenged force was employed. *Smith*, 781 F.3d at 101. Such an examination involves a balancing of the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (citing *Graham*, 490 U.S. at 396). As stated by the Fourth Circuit,

> To properly consider the reasonableness of the force employed we must view it in full context, with an eye toward the proportionality of the force in light of all the circumstances. Artificial divisions in the sequence of events do not aid a court's evaluation of objective reasonableness. We must also give careful attention to the facts and circumstances of each particular case, including three factors in particular: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. Ultimately, the question to be decided is whether the totality of the circumstances justifie[s] a particular sort of seizure.

*Smith*, 781 F.3d at 101 (internal quotations and citations omitted) (alteration in original). Because "'police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain and rapidly evolving – about the amount of force that is necessary,'" courts must evaluate facts from the perspective of a reasonable officer on the scene without the use of hindsight. *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014) (quoting *Graham*, 490 U.S. at 396-97); *see also Waterman v. Batton*, 393 F.3d 471, 476-77 (4th Cir. 2005) (quoting *Graham*, 490 U.S. at 397).

"Qualified immunity shields government official performing discretionary functions from personal-capacity liability for civil damages under § 1983, insofar as their conduct does not violate clearly established statutory or constitutional rights which a reasonable person would have known." *Brockington v. Boykins*, 637 F.3d 503, 506 (4th Cir. 2011) (internal citation

9

and quotation omitted). Officials will receive immunity unless the § 1983 claim satisfies a two-pronged test: (1) the allegations, if true, substantiate a violation of a federal statutory or constitutional right and (2) the right was clearly established such that a reasonable person would have known his acts or omissions violated that right. *Id.*; *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (setting up the two-pronged framework). Summary judgment on qualified immunity grounds is appropriate if the answer to either prong is "no." *Smith* 781 F.3d at 101.

Under the prior order of this Court, the only issue left for consideration in this case is whether there is a genuine issue of material fact as to the reasonableness of the actions of the Defendants during the terminal moments of the shootout. Plaintiff argues that Defendants used excessive force in shooting him after he was on the ground and had surrendered. Defendants contend that the officers acted reasonably, without excessive force, and further, that they are entitled to qualified immunity on the excessive force claim. Thus, to receive qualified immunity, Defendants must prove either (1) that their conduct did not violate the constitutional right at issue (here, the Fourth Amendment's prohibition on excessive force) or (2) that the right was not "clearly established" at the time of the incident. *Pearson* 555 U.S. at 236.

### B. Excessive Force – Defendants Jones, Cranford, Wrenn and Bennett

Plaintiff has submitted no evidence as to which officers' rounds allegedly struck him during the terminal moments of the shootout and he has stated in an interrogatory response that he cannot identify the officers involved. Four of the defendants have stated that they were not engaged in the final moments of the shootout. In his declaration, Defendant Jones

stated that after Plaintiff exited the vehicle Defendant Jones could no longer see Plaintiff so he did not fire his weapon after that point. (Jones Decl. ¶¶ 9-10, Docket Entry 99.) Defendants Cranford and Bennett also stated that they stopped firing at Plaintiff after he exited the vehicle. (Bennett Decl. ¶ 10, Docket Entry 100; Cranford Decl. ¶ 9, Docket Entry 102.) Defendant Wrenn stated that he had emptied a magazine by the time Plaintiff was exiting the vehicle and had turned away to reload. When he resumed position, he saw Plaintiff fall to the ground, out of Officer Wrenn's sight, and so he did not fire any shots from the second magazine. (Wrenn Decl. ¶ 12, Docket Entry 103.)

As such, as to his claim that he was shot after exiting the car, falling to the ground and surrendering, the evidence is undisputed that Defendants Jones, Cranford, Wrenn and Bennett could not have shot Plaintiff as he lay on the ground in a vulnerable position because they had stopped firing before the terminal moments of the encounter. Thus, as to these Defendants, because the evidence does not show "a violation of a federal statutory or constitutional right," summary judgment is proper.

### C. Excessive Force – Defendants Flynt, Randazzo and O'Hal

Defendants Flynt, Randazzo and O'Hal admittedly fired shots at Plaintiff during the terminal moments of the encounter. Thus, the analysis as to these Defendants is somewhat different, requiring the court to examine the evidence and determine whether the use of deadly force at the time of the encounter was reasonable under the totality of the circumstances. *Plumhoff*, 134 S. Ct. at 2020.

Plaintiff contends that he was shot by Defendants as he lay on the ground and had surrendered. The record evidence, even taken in the light most favorable to Plaintiff, does

11

not support this contention. Defendant Randazzo stated in his declaration that Plaintiff aimed a gun at him and Defendant O'Hal while Plaintiff was still in the vehicle, and that Plaintiff continued to do so after he exited the vehicle. (Randazzo Decl. ¶¶ 8-11, Docket Entry 97.) Defendant Randazzo further stated that "[o]nce Mr. Patterson went to the ground and was not aiming his handgun at anyone, I adjudged the threat to have ended, and I immediately ceased firing my service weapon." (*Id.* ¶ 13.)

Defendant O'Hal stated in his declaration that after hearing radio traffic about a high speed chase in which shots were fired from the suspect vehicle, he proceeded to a location on Patterson Street near Interstate 40. (O'Hal Decl. ¶¶ 4-5, Docket Entry 98.) As the vehicle approached, Officer O'Hal deployed "stop sticks" in an attempt to puncture the tires of the suspect vehicle and end the pursuit. (*Id.* ¶ 5.) The suspect vehicle approached and swerved to avoid the sticks, skidding off the road. (*Id.* ¶6.) Officer O'Hal then observed the vehicle approach him and accelerate in his direction, striking Defendant O'Hal and pinning him against his police vehicle. (*Id.*) The vehicle than spun away off the road and came to a stop 35-40 feet away, at which point Defendant O'Hal saw Plaintiff open the driver's side door and point a handgun in his direction. (*Id.* ¶ 7.) When Plaintiff exited the car, Officer O'Hal, fearing for his own safety, shot at him. (*Id.* ¶ 9.) Plaintiff fired at Defendant O'Hal several times, hitting him twice. (*Id.* ¶ 11.) After Plaintiff exited the car, he was crouched on his knees and continued to aim his gun in the direction of Officer O'Hal. (*Id.* ¶ 12.) Defendant O'Hal stated that "[a]t no time did [he] see Mr. Patterson stand up, raise his arms or take any other physical act that could be construed as an attempt to surrender" nor did he make "any statement that could be construed as an attempt to surrender." (*Id.* ¶¶ 13-14.) Defendant

O'Hal further stated that once Plaintiff fell to the ground and was not aiming his handgun at any of the officers, Officer O'Hal ceased firing his weapon. (*Id.* ¶ 16.) He did not see or hear any other officers engage Plaintiff after that time. (*Id.*)

Defendant Flynt was also involved in the chase and shootout. He stated in his declaration that he observed Plaintiff engaging other officers with a handgun, while Plaintiff was still in the vehicle. (Flynt Decl. ¶¶ 8-19, Docket Entry 101.) He also saw Plaintiff aim the handgun at Officers O'Hal and Randazzo after Plaintiff exited the vehicle. (*Id.* ¶ 13.) Officer Flynt stated that Plaintiff never stood straight up after exiting the vehicle, and Flynt never saw Plaintiff "raise his arms over his head or take any other action that could be interpreted as an attempt to surrender." (*Id.* ¶ 11.) Officer Flynt stated that he recalled Plaintiff saying something like "stop f---ing shooting" but even as he shouted that he continued to aim his handgun in the direction of the officers. (*Id.* ¶ 12.) Defendant Flynt stated that once Plaintiff's whole body, including his arms, came to a rest on the ground Officer Flynt immediately ceased firing, as did the other officers. (*Id.*)

The dashboard camera video shows a loud and chaotic scene, as to be expected in a quickly developing situation involving fleeing bank robbers, a high-speed chase, and a shootout between suspects and police officers. (*See* Wrenn Decl. ¶ 9 and Ex. A thereto, Docket Entry 103.) While Plaintiff contends that the dashboard camera provides evidence that he was shot excessively after he had surrendered and while lying on the ground unarmed, this Court's viewing of the video suggests that it does not support Plaintiff's claim. The vehicle in which the camera was located was parked some distance from where Plaintiff's vehicle came to a stop. The camera's view was obstructed by a civilian vehicle which was

13

caught in all the confusion, and thus does not show Plaintiff during the terminal moments of the encounter. The video does not reveal a surrender by Plaintiff because the view was blocked. The gunshots can be heard on the video (and indeed gunsmoke is visible in the air on the other side of the civilian vehicle), but the gunfire lasts at most sixty seconds, perhaps less, and there does not seem to be a significant break in the shooting. Moreover, the video does not contain any admission by any Defendant of a violation of Plaintiff's constitutional rights.[1]

In light of the facts and circumstances of this quickly developing situation, "it is beyond serious dispute that [Plaintiff's] flight posed a grave public safety risk, and . . . [that] the police acted reasonably in using deadly force to end that risk." *Plumhoff*, 134 S. Ct. at 2022. Moreover, there is clear evidence that Plaintiff continued to shoot at the officers even as his vehicle was surrounded and he began to exit the vehicle. Conversely, there is no evidence, other than Plaintiff's self-serving contention, that he exited the vehicle in a manner which would suggest a desire to surrender. Indeed, Plaintiff's actions all indicated a desire to flee the police and seriously wound the officers who stood in his way. All the officers who were involved in the pursuit and shootout believed Plaintiff was still brandishing a firearm,

---

[1] Plaintiff submitted what he claims to be a verbatim handwritten transcript/narrative of the dashboard camera video. (*See* Docket Entry 35 at 16-24; Docket Entry 93.) This transcript was allegedly prepared by a woman named SamRosezena Matthews. (*See* Docket Entry 32 at 2.) There is no claim that Ms. Matthews is an expert in transcription; indeed, the Court has no information about her experience, training or relationship to Plaintiff. To the extent Plaintiff is seeking to introduce this transcript for the Court's consideration, Defendants object. (*See* Def.'s Resp. to Pl.'s Affidavit of Fact, Docket Entry 109.) At any rate, under the 'best evidence rule," because the actual dashboard recording has been submitted to the Court, there is no basis to admit any other purported proof as to the contents of the video. FED. R. EVID. 1002; *see also Buruca v. District of Columbia*, 902 F. Supp. 2d 75, 83 (D.D.C. 2012) (quoting *Gordon v. United States*, 344 U.S. 414, 420 (1953)) ("The elementary wisdom of the best evidence rule rests on the fact that the [recording itself] is a more reliable, complete and accurate source of information as to its contents and meaning than anyone's description [of it].").

threatening their safety and the safety of other citizens, when the officers fired their final rounds.

The Supreme Court and the Fourth Circuit have clearly held that in excessive force cases the analysis must focus on the reasonableness of the officer's actions, under the totality of the circumstances. *Graham*, 490 U.S. at 397; *Smith*, 781 F.3d at 101. Here, the responding officers had reason to believe that Plaintiff was extremely dangerous, given both the reports of the bank robbery, the attempts to flee and the gun battle which ensued. The gun battle, which involved both suspects and multiple police officers, was over in a minute or less. There is simply no evidence of a break in the shooting, *i.e.*, no evidence that Defendants initiated a second round of shots after the first round had clearly incapacitated Plaintiff and eliminated any threat. *See Plumhoff*, 134 S. Ct. at 2022 In *Plumhoff*, the Court held that police officers did not use excessive force in firing shots and killing a suspect who posed a grave public safety risk by engaging in a high speed and reckless car chase, even though the chase had momentarily stopped, reasoning that the suspect was still attempting to flee in his car. Here, the facts are even more compelling. The evidence shows that there was a high speed chase (following an armed bank robbery), which officers unsuccessfully attempted to end by the use of "stop sticks," and which escalated into a gun battle between the fleeing felons and police officers on or near a bust highway. Additionally, officers observed Plaintiff maneuvering his car to hit and pin Officer O'Hal up against his police vehicle, as well as shooting the officer at least twice. Plaintiff exited the car still brandishing his firearm and officers reasonably perceived him to be a continued threat. Under the circumstances at that time, reasonable police officers could have concluded that Plaintiff intended to continue to

15

shoot, endangering other officers or ordinary citizens caught in the melee. Even viewing this claim in the light most favorable to Plaintiff, there are no genuine issues of material fact. The Court finds that Defendants' conduct did not violate Plaintiff's Fourth Amendment rights and Defendants are entitled to summary judgment.

Even if this Court were to find that Defendants' conduct violated the Fourth Amendment, Defendants would still be entitled to summary judgment based on qualified immunity. "An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was 'clearly established' at the time of the challenged conduct." *Plumhoff*, 134 S. Ct. at 2023 (citing *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011)). In excessive force cases, as noted by the Supreme Court in *Plumhoff*, "the result depends very much on the facts of each case." *Id.* "An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it, meaning that existing precedent . . . placed the statutory or constitutional question beyond debate." *City and Cnty. of San Francisco, California v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (internal quotation marks and citations omitted) (alterations in original). "This exacting standard gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks, alteration, and citation omitted).

Here, clearly established law does not show the conduct of the police officers was unconstitutional. As noted by the Supreme Court in *Plumhoff*, no precedent "clearly established that it was unconstitutional to shoot a fleeing driver to protect those whom his

16

flight might endanger." 134 S. Ct. at 2023. The facts here are even more compelling than those in *Plumhoff*, given the undisputed fact that Plaintiff was fleeing from police following an armed bank robbery (to which he later pled guilty), had exchanged gun fire with police and had struck an officer with his vehicle while attempting to flee, and exited the car still holding and pointing his firearm. Indeed, Plaintiff has presented no evidentiary basis to support his theory that there was a break in the shooting and that therefore Defendants did not genuinely and reasonably believe that Plaintiff posed a threat.

Because it was not clearly established that Defendants' actions were constitutionally unreasonable in these circumstances, the Court holds that Defendants are protected by qualified immunity.[2]

## IV. CONCLUSION

This court finds that there is no genuine issue of material fact and therefore Defendants are entitled to summary judgment. Accordingly, the Court **RECOMMENDS** that Defendants' motion for summary judgment (Docket Entry 95) be **GRANTED**. The

---

[2] On December 29, 2014, Defendants filed a second motion to dismiss in this action, based on language in a document filed by Plaintiff. (Docket Entry 82.) In the document referred to by Defendants, titled "Affidavit of Fact: Acknowledgement of Protective Order and Objection to Stipulations" (Docket Entry 80), Plaintiff stated that he "objects to the Court enforcing mere statutes and denies consentment [sic] to the Jurisdiction of this Court as it must be proven." (*Id.* at 1.) Plaintiff further stated: "I Christopher Oneal Patterson-Bey, being in propria persona hereby objects to consent to the Jurisdiction of this Court and or any Court within the United States Corporation." (*Id.* at 4.) Defendants, in their motion to dismiss, argue that Plaintiff's rejection of this Court's jurisdiction operates as a voluntary dismissal of his claim. (*See* Def.'s Br., Docket Entry 83.) Plaintiff responded to the motion to dismiss, but it is difficult to understand his response, which mostly appears to be a recitation of the history of the "Moorish American Nationality." (Docket Entry 86.) The Court notes that Plaintiff has continued to file many documents subsequent to this Affidavit of Fact, suggesting that he has submitted to the jurisdiction of this Court. At any rate, because the Court finds that summary judgment is proper, Defendants' motion to dismiss should be denied as moot.

Court further **RECOMMENDS** that Defendants' motion to dismiss (Docket Entry 82) be denied as moot.

_____
Joe L. Webster
United States Magistrate Judge

Durham, North Carolina
September  3 , 2015