IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CHRISTOPHER O'NEAL PATTERSON,    )
                                 )
            Plaintiff,           )
                                 )
        v.                       )        1:11-CV-138
                                 )
JASON RANDAZZO, GERALD JONES,    )
KRISTIN BENNETT, JUSTIN FLYNT,   )
MATTHEW O'HAL, JOEL CRANFORD,    )
and ERNEST K. WRENN,             )

            Defendants.

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

     This is an excessive force case brought under the Fourth
Amendment.    Before the court is Defendants' motion for summary
judgment.   (Doc. 95.)   On September 3, 2015, the United States
Magistrate Judge filed a Recommendation to grant the motion, and
notice was served on the parties in accordance with 28 U.S.C.
§ 636(b).    (Doc. 118.)    Plaintiff filed objections to the
Recommendation (Doc. 120), and Defendants filed a response (Doc.
121).

     The court's obligation is to conduct a *de novo* determination
of those portions of the Recommendation to which Petitioner
objects.   28 U.S.C. § 636(b)(1).   Having done so and for the
reasons set forth below, the Recommendation will be adopted but
as modified herein, Defendants' motion for summary judgment will

be granted, and the case will be dismissed.[1]

## I.   BACKGROUND

This case arises from injuries Plaintiff, Christopher O'Neal Patterson, sustained when he was shot by police after he participated in an armed bank robbery, led law enforcement on a high speed car case, and engaged in a shootout with them in which his accomplice, Dimarkchrisy Eddie Majors, was killed. Patterson ultimately pled guilty to one count of interference with commerce by robbery (18 U.S.C. §§ 2, 1951(a)), one count of carry and use, by brandishing and discharging, of a firearm during and in relation to a crime of violence (18 U.S.C. §§ 2, 924(c)(1)(A)(iii) and (c)(1)(C)(i)), armed bank robbery (18 U.S.C. §§ 2, 2113(a) and (d)), and one count of carry and use, by brandishing and discharging, of a firearm during and in relation to a crime of violence causing the death of a person (18 U.S.C. §§ 2, 924(c)(1)(A)(iii), (c)(1)(C)(i), and (j)(1)).   He was sentenced to 744 months of imprisonment.[2]  The Fourth Circuit affirmed his conviction and sentence.   United States v.

---

[1] Consequently, like the Recommendation, the court need not reach Defendants' separate motion to dismiss made on alternative grounds. (Doc. 82.)

[2] Patterson also pled guilty to having assaulted the prosecuting Assistant United States Attorney immediately after sentencing and was sentenced by another district judge to an additional 46 months (26 of which were imposed consecutive to his sentence in the instant case). United States v. Patterson, No. 1:10cr421, Doc. 15 (M.D.N.C. Aug. 3, 2011).

2

<u>Patterson</u>, 443 F. App'x 843 (2011).

Defendants are seven members of the Greensboro Police Department ("GPD"): officers Jason Randazzo, Matthew O'Hal, Justin Flynt, Ernest K. Wrenn, Gerald Jones, Joel Cranford, and Kristin Bennett. Patterson claims Defendants violated his Fourth Amendment rights by using excessive force to shoot him after he attempted to surrender at the terminal moments of the events. This court previously denied the officers' motion to dismiss "to the extent Patterson allege[d] that [they] continued to shoot him after it became clear that he had surrendered, remained subdued and unarmed, and no longer posed a threat," as "the nature and timing of Patterson's alleged surrender" was not clear on the record then before the court. <u>Patterson v. Randazzo</u>, No. 1:11cv138, 2013 WL 5461817, at *8-9 (M.D.N.C. September 30, 2013). The officers' motion to dismiss was granted in all other respects because Patterson's own allegations made it clear that prior to the alleged moment of clear surrender, "Patterson and his accomplice were engaged in a shootout with police, posed an immediate threat to the officers, and were actively evading arrest." <u>Id.</u>

The following facts are not in dispute. On February 9, 2009, at about 5:15 p.m., Patterson and Majors robbed a bank at gun point and engaged GPD in a high speed chase in an effort to elude capture. During the chase, multiple shots were fired at

3

police from the Infiniti passenger car Patterson was driving. (Doc. 115 ¶ 4.) In an effort to detain Patterson and Majors, officers set out "stop sticks." (Id. ¶ 6.) As Patterson's vehicle approached the stop sticks, shots were fired out of Patterson's vehicle at O'Hal. (Id.) Patterson's vehicle eventually swerved, hit Officer O'Hal, and pinned him against O'Hal's vehicle (ultimately shattering his leg). (Id.) A gunfight between O'Hal and an occupant of Patterson's vehicle continued. (Id. ¶ 6-7.) Patterson reversed his vehicle, unpinning O'Hal, and attempted to continue to drive. (Id. ¶ 9.) The vehicle, however, spun around and came to rest off the road near a line of trees. (Id.) During an exchange of further gunfire, Majors was mortally wounded. (Id. ¶¶ 10-11.)

Beyond these facts, the parties' versions of events differ significantly.

Patterson has submitted affidavits in support of the following version of events: Once his vehicle came to its final resting place, Patterson contends, he got low in his car and remained in that position for at least sixty seconds. (Id. ¶ 9.) After a brief discussion with Majors, he put his revolver to his head and attempted to kill himself, but the gun jammed. (Id. ¶ 10.) He then left his gun in the driver's seat and "was too terrified to look in the direction of where the bullets were coming but knew they were coming from behind [him]." (Id. ¶ 11.)

4

According to Patterson, he exited the vehicle unarmed, "threw [his] hands up and yelled for police to stop shooting." (Id. ¶ 12.) Patterson claims he took "two to three steps[,] five at the most," and then was shot in his left tibia. (Id.) The force of the impact knocked him to his knees, where "numerous warm projectiles invade[d] [his] upper back arm and mid-torso." (Id. ¶ 13.) He went face down to the ground, facing away from the gunfire (id. ¶ 14), and claims:

> While I lay on the ground facing away from defendants[,] hands stretched out in front of me[,] blood dripping in my eye from a graze to the face[,] head in the grass waiting for death to call, I felt a warm, sensational and powerful impact penetrate my right thigh[,] my thigh[,] traveling up my thigh[,] causing my whole lower body to become warm. This impact caused me to, with both hands[,] rip grass out of the ground. At this time all firing ceased.

(Id. ¶ 13.) Patterson does not indicate the timing of this last alleged shot, nor does he contend that he was out of the car for more than a few seconds. While on the ground, he says, he observed an officer take his (Patterson's) gun out of the driver's seat and toss it onto the ground. (Id. ¶ 16.)

Defendants' affidavits support a very different version of events. In summary, Defendants contend that Patterson had a gun when he exited his vehicle, went to a crouched position, continued to point his gun at officers, and eventually went to the ground with his hands out and away from his body. Defendants contend they stopped firing once Patterson's hands were out and away from

5

his body on the ground.

Specifically, Officer Randazzo states in his declaration that he was positioned with O'Hal approximately forty feet behind the driver's side of Patterson's vehicle. (Doc. 97 ¶ 7.) From this position, Randazzo contends, he saw that Patterson's driver's side door was open and that Patterson was reaching in and out of the car to aim and shoot in the direction of O'Hal and Randazzo. (Id. ¶ 8.) Once Patterson exited his vehicle, Randazzo says, Patterson did not stand straight up or surrender, but instead crouched and continued to aim his handgun at him and O'Hal. (Id. ¶ 9.) Randazzo says that Patterson continued to aim his handgun at him as Patterson went to his knees. (Id. ¶ 11.) Randazzo then observed that Patterson went to the ground and no longer appeared to be aiming the gun at anyone. (Id. ¶ 13.) Randazzo says he immediately stopped firing and did not hear or see any other officers fire their weapons after Patterson had ceased to be a threat. (Id.)

O'Hal states in his declaration that he was located approximately forty feet behind the driver's side of Patterson's vehicle. (Doc. 98 ¶ 7.) From there, he observed Patterson open the driver's side door and point his handgun out of the car with his right hand. (Id. ¶ 8.) Patterson then exited the car with his handgun pointed in O'Hal's direction. (Id. ¶ 9.) According to O'Hal, Patterson fired at him both before and after exiting

6

the vehicle, hitting him twice. (Id. ¶ 11.) Once Patterson exited the vehicle, O'Hal says Patterson attempted to stand but instead crouched and then went to his knees. (Id. ¶ 12.) While on his knees, O'Hal states, Patterson continued to point his gun at him. (Id.) O'Hal says that he never saw or heard a sign of surrender. (Id. ¶ 13.) After Patterson went to the ground, O'Hal contends, Patterson's arm was extended away from his body and did not appear to be aiming his gun at anyone. (Id. ¶ 16.) O'Hal says he immediately stopped firing and did not hear or see any shots fired after Patterson had ceased to pose a threat. (Id.)

Officer Flynt contends that he was positioned approximately one hundred feet behind, and on the passenger's side of, Patterson's vehicle. (Doc. 101 ¶ 7.) From this position, Flynt claims to have been able to see Patterson through a broken out window of the vehicle. (Id. ¶ 8.) Flynt states that he observed Patterson reaching out of the vehicle and engaging other officers at the scene with a handgun. (Id. ¶ 9.) Flynt also says he saw Patterson shoot at Officer Cranford, who was located in front of Patterson's vehicle. (Id.) Once Patterson exited his vehicle, Flynt fired at him as Patterson continued to aim his handgun in the direction of O'Hal and Randazzo. (Id. ¶ 10.) According to Flynt, Patterson did not stand straight up after exiting the vehicle, but instead crouched, went to his knees, and eventually

7

went to the ground. (Id. ¶ 11.) Though Flynt heard Patterson say to "stop f---ing shooting," Flynt claims he did not interpret that as a sign of true surrender because, according to Flynt, Patterson continued to aim his handgun at other officers. (Id. ¶ 12.) Flynt contends that Patterson continued to engage the officers until his "whole body, including his arms, came to a rest on the ground." (Id. ¶ 13.) At that time, Flynt says, he immediately stopped firing. (Id.) Flynt did not hear or see any other officer fire at Patterson after he ceased to pose a threat. (Id.)

Officer Wrenn contends that he was positioned so that he could see Patterson in the driver's seat of the vehicle. (Doc. 103 ¶ 9.) Wrenn states that Patterson was "turning to his left, moving in and out of the car" to shoot at O'Hal and Randazzo. (Id.) According to Wrenn, Patterson attempted to stand as he exited the vehicle, but Wrenn "never saw him stand straight up." (Id. ¶ 11.) Wrenn fired "one or two rounds after Mr. Patterson began to exit the vehicle." (Id.) At that point, however, Wrenn says, his magazine emptied and he took cover to reload. (Id. ¶ 12.) By the time Wrenn attempted to re-engage, Patterson was on the ground and not visible to him. (Id.)

Officer Jones contends that he was located approximately 200 feet away on the front passenger side of Patterson's vehicle. (Doc. 99 ¶¶ 5-6.) Officer Cranford states that he was located

8

approximately one hundred feet away and on the passenger side of Patterson's vehicle. (Doc. 102 ¶ 5.) According to Officer Bennett, she was one hundred feet behind and to the passenger's side of Patterson's vehicle. (Doc 100 ¶ 7.) Jones, Cranford, and Bennett contend that they either could not see, or did not have a good view of, Patterson as he exited the vehicle. (Doc. 99 ¶ 10; Doc. 100 ¶ 10; Doc. 102 ¶ 9.) Consequently, each claims not to have fired after Patterson exited his vehicle. (Doc. 99 ¶ 10; Doc. 100 ¶ 10; Doc. 102 ¶ 9.)[3]

Three videos have been submitted in this case. The first is a dashboard recording from Wrenn's vehicle. It establishes that the scene was loud and chaotic, the sky was overcast, the time was late in the afternoon, and Patterson's driver side door was near a line of trees. (Doc. 121-1.) At 1:39 in the video, gunshots can be heard as Wrenn's vehicle arrives and multiple

---

[3] Patterson points to interview notes of several GPD officers by the North Carolina Department of Public Safety's State Bureau of Investigation. Specifically, in his interview, Officer Flynt reportedly stated:

> When I saw the driver [Patterson] aiming and shooting at the officers I began shooting at the driver in defense of the other officers['] lives. The driver got out of the car, stopped shooting and yelled 'stop f[---]ing shooting at me!' He then got down on the ground.

(Doc. 35 at 10, Ex. A.) Officer Randazzo, likewise, reportedly stated that Patterson "got out of the car and got on the ground with his hands up and said 'stop shooting.'" (Id. at 11.) Patterson notes that none of the officers mentions whether Patterson had a gun when he exited the car. But Flynt's and Randazzo's statements to investigators do not directly contradict the officers' declarations.

9

officers are already engaging Patterson. The sound on the video is poor and intermittent, but many gunshots can be heard through the discontinuous recording. At 2:56, several officers can be seen leaving their cover and moving toward Patterson's vehicle. By 3:49, officers are moving away from the scene.

Because a civilian car obstructs the view of Patterson's vehicle for the duration of the shootout, Patterson's vehicle cannot be seen until after the critical events, including all shooting, are over. At no time can Patterson be seen. Further, although the video provides some evidence of timing, it does not permit the court to determine how long the shooting lasted, and this is especially true for the time Patterson exited the vehicle. Because the audio goes in and out repeatedly, it is impossible to tell exactly when gunfire ceased. In addition, because Wrenn's vehicle arrives while the shootout is underway, it is impossible to tell from the video when the gunfire began. Defendants' declarations do not establish how long Patterson was out of his car or how quickly the final, critical moments outside the car unfolded. Consequently, the video does not establish how long Patterson was out of his car, or whether Patterson's hands went up, as Patterson cannot be seen in the video.

The second and third videos are of even less assistance. They are shot from cellphones from a long distance, are of very poor quality, and do not allow a determination of what occurred

10

when Patterson exited his vehicle.

Neither party has submitted evidence that would permit the determination of which version of events transpired without weighing credibility. Neither party has submitted any ballistics reports, medical reports, or videos that clearly establish one version to be untenable. Instead, the record is effectively Patterson's affidavits versus the Defendant officers' declarations.

Patterson and Defendants disagree about whether Patterson was armed when he exited the vehicle, whether his hands went up, and whether he was shot after he was on the ground after clearly surrendering. Consequently, Patterson argues that he has raised a genuine issue of material fact as to whether Defendants used excessive force in shooting him while he was attempting to surrender and while he lay prone on the ground. Defendants rely on their version of events and support the Magistrate Judge's conclusion that the use of force was objectively reasonable and alternatively protected by qualified immunity as a matter of law.

## II. ANALYSIS

### A. Judicial Estoppel

Defendants contend initially that the court must reject Patterson's affidavits under the doctrine of judicial estoppel to the extent they assert a version of events that contradicts the factual basis for his plea agreement in the underlying

11

criminal case. (Doc. 96 at 11.) This issue was raised before the Magistrate Judge but not addressed in the Recommendation.

The purpose of judicial estoppel is "to protect the integrity of the judicial process." New Hampshire v. Maine, 532 U.S. 742, 749 (2001). The doctrine requires three elements: (1) "the party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in prior litigation," (2) "the prior inconsistent position must have been accepted by the court," and (3) "the party sought to be estopped must have 'intentionally misled the court to gain unfair advantage.'" Lowery v. Stovall, 92 F.3d 219, 224 (4th Cir. 1996). This court raised the possible application of the doctrine of judicial estoppel at the motion to dismiss stage, and Defendants now urge it to preclude Patterson's claims; yet, they have provided little articulation of how the doctrine applies to the facts of this case other than simply offering the conclusory statement that Patterson "is judicially estopped" by his factual basis at the plea hearing in his criminal case. (Doc. 96 at 11.)

The factual basis for Patterson's guilty plea to the underlying criminal charges provided in pertinent part:

> Officers began firing at the suspect vehicle. The passenger, later identified as Dimarkchrisy Eddie Majors[,] was shot and killed. <u>The driver, identified as Christopher O'Neal Patterson, continued firing, but eventually got down on the ground and dropped his gun.</u> Paterson was shot several times during this confrontation.

12

(Doc. 20 in case 1:09CR54 at 4 (emphasis added).).  The factual basis contradicts Patterson's claim that he exited the car unarmed but, as this court previously noted, does "not necessarily contradict [his] claim that he surrendered when he exited the vehicle or that he was shot again after he lay on the ground." Patterson, 2013 WL 5461817, at *5.  In addition, while the factual basis says Patterson continued firing after Majors was shot and killed, it does not say whether this firing occurred inside or outside (Defendants' contention) the car, especially given the modifier "eventually."  Moreover, the factual basis does not say whether Patterson had a gun in his hand once he was on the ground with his hands out in front of him.  Even if the statement is interpreted as meaning that Patterson went to the ground and then dropped his gun,[4] it does not dictate how close in time these events occurred.

Judicial estoppel, if applied, would have Patterson exiting the vehicle armed, at least up to the point where he is on the ground with his hands out in front of him.  The only thing the factual basis is truly inconsistent with is Patterson not having a gun prior to going to the ground.[5]  Patterson can, consistent

---

[4] The factual basis is also consistent with the two events occurring simultaneously.

[5] The ambiguity of the factual basis with regard to sequence and timing may be reflective of the fact that this part did not deal with facts

13

with the factual basis, claim that he (1) got out of his car, (2) raised his hands (albeit with a gun in them) and yelled for police to stop shooting, (3) took two to five steps, (4) was shot in his left tibia, (5) went to his knees, (6) was shot multiple times in his upper back, arm, and mid-torso (7) got down on the ground with his hands stretched out in front of him, (8) dropped his gun, and (9) was shot in his right thigh. Judicial estoppel cannot preclude this sequence of events.

The question remains whether Patterson can be judicially estopped from claiming that he exited his vehicle unarmed (i.e., whether the last two prongs of the judicial estoppel test are met). Despite Defendants' urging, this court declines to resolve this question at this time because, even if Patterson were unarmed, and for the reasons that follow, it would not change the result.[6]

---

central to Patterson's plea.

[6] This question may nevertheless be more complicated than Defendants admit. Patterson at sentencing did not say he exited his vehicle armed so that, as in Lowery, it could be held against him as a position he took even though it was not an element of any offense of conviction. See Lowery, 92 F.3d at 224 (estopping the plaintiff in § 1983 case from denying secondary fact that he attacked the officer in order to escape where plaintiff had told the court that this secondary fact was true). In addition, being armed when he exited the vehicle was not a necessary element for Patterson's conviction such that he would not have been able to plead guilty without conceding it. See Dorsey v. Ruth, 222 F. Supp. 2d 753, 755-56 (D. Md. 2002) (estopping the plaintiff in § 1983 case from asserting facts from his criminal plea that were clearly necessary to finding guilt as to an element of the criminal charge of assaulting a police officer). Rather, Patterson did not object to the prosecutor's proffer that he (Patterson) exited the car armed. On this

**B.   Summary Judgment Standard**

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The party moving for summary judgment carries the burden of showing that there is no genuine dispute of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). "[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" <u>Hunt v. Cromartie</u>, 526 U.S. 541, 552 (1999) (alteration in original) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986)). All evidence, including

---

record, Defendants have not indicated how Patterson's failure to object constituted taking a "stance" or "position" in his criminal plea, as contemplated by <u>Lowery</u>. This court earlier had raised the concern whether Patterson might be judicially estopped when the court adopted the contents of the factual basis in Patterson's <u>presentence report</u> at sentencing. <u>Patterson</u>, 2013 WL 5461817 at *5 n.4. For some reason, Defendants have not addressed this distinction. It is certainly notable that whether Patterson was armed (or not) when exiting the car was relevant to sentencing. It constitutes "relevant conduct" under U.S.S.G. 1B1.3, which the sentencing judge "shall" take into account in fashioning a sentence. U.S.S.G. § 1B1.3(a)(1)(A) (including as relevant conduct for sentencing "all acts and omissions committed . . . by the defendant . . . that occurred during the commission of the offense of conviction . . . or in the course of attempting to avoid detection or responsibility for that offense"). It is relevant to the nature and circumstances of the offense, the seriousness of the offense, and just punishment under 18 U.S.C. § 3553(a) whether a defendant continues to engage in gunfire with law enforcement – and chooses not to unequivocally surrender - even after he is hopelessly surrounded. However, with no guidance from the parties, and insofar as judicial estoppel is to "be applied with caution" and only "in the narrowest of circumstances," <u>Lowery</u>, 92 F.3d at 224, the court declines to venture into further analysis here where other grounds indicate that summary judgment should nevertheless be granted.

movant's, must be viewed in the light most favorable to the non-movant. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 158-59 (1970). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248. The court is not permitted to weigh the evidence, assess credibility, or resolve issues of fact. <u>Id.</u> at 255. The law preserves these core jury functions for trial because "it is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised." <u>Adickes</u>, 398 U.S. at 176.

### C. The Magistrate Judge's Recommendation

In recommending that Defendants' motion for summary judgment be granted, the Magistrate judge credited the officers' version of events. That is, the Recommendation based both its excessive force and qualified immunity conclusions on the fact that Patterson "exited the car still brandishing his firearm" (Doc. 118 at 15) and "pointing his firearm" at officers (<u>id.</u> at 17). However, as noted above, Patterson disputes these very facts. He claims that he exited the vehicle unarmed and that he raised his hands, which the Recommendation acknowledges. (<u>Id.</u> at 7 (setting forth Patterson's version of events).) The Recommendation found Patterson's affidavit to be "self-serving." (<u>Id.</u> at 14.) Of course, all of the Defendants' sworn statements are potentially

16

self-serving as well, as they come from officers involved in the shooting. See Webb v. Raleigh Cty. Sheriff's Dep't, 761 F. Supp. 2d 378, 391 (S.D.W. Va. 2010) (noting that the court cannot simply accept "self-serving" accounts of the officers). Given the limited evidence available, which side is correct as to these facts necessarily depends on a determination of credibility, which cannot be made at this stage. The court must therefore construe the evidence in the light most favorable to Patterson as the non-moving party and determine whether Defendants are nevertheless entitled to prevail.

D. **Excessive Force**

Defendants contend that, as a matter of law, they did not use excessive force when Patterson exited his vehicle because they reasonably perceived him to pose a threat of serious physical injury to them and others.

Excessive force claims against officers are analyzed under the Fourth Amendment's reasonableness standard. Graham v. O'Conner, 490 U.S. 386, 395 (1989). The question under the totality of the circumstances is "whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." Anderson v. Russell, 247 F.3d 125, 129 (4th Cir. 2001). In determining whether a reasonable officer on the scene would have used force, courts are to consider "the severity of the crime at issue,

17

whether the suspect poses an immediate threat to the safety of
the officers or others, and whether he is actively resisting
arrest or attempting to evade arrest by flight." Graham, 490
U.S. at 396. An officer may reasonably "use deadly force when
the officer has 'probable cause to believe that the suspect poses
a threat of serious physical harm, either to the officer or
others.'" Anderson, 247 F.3d at 129 (quoting Tennessee v. Garner,
471 U.S. 1, 11 (1985)). "[T]he 'reasonableness' of a particular
use of force must be judged from the perspective of a reasonable
officer on the scene, rather than with the 20/20 vision of
hindsight." Graham, 490 U.S. at 396. Courts must consider "that
police officers are often forced to make split-second judgments
— in circumstances that are tense, uncertain, and rapidly
evolving." Id. at 397. Courts are also instructed to focus "on
the circumstances at the moment force was used and on the fact
that officers on the beat are not afforded the luxury of armchair
reflection." Elliot v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996).
Nevertheless, "force justified at the beginning of an encounter
is not justified even seconds later if the justification for the
initial force has been eliminated." Waterman v. Batton, 393 F.3d
471, 481 (4th Cir. 2005) ("To simply view all of the force
employed in light of only the information possessed by the officer
when he began to employ force would limit, for no good reason,
the relevant circumstances to be considered in judging the

constitutionality of the officer's actions.").

In Brockington v. Boykins, 637 F.3d 503 (4th Cir. 2011), the Fourth Circuit noted that the reasonableness of a use of force may turn on whether there was "a clear break in the sequence of events." Id. at 507. There, a police officer shot the plaintiff while the two were on the backyard steps of a vacant house. Id. at 505. As a result of the shot, the plaintiff fell "off the stairs and onto the cement landing below." Id. "As [the plaintiff] lay on his back, [the officer] stood directly over him and fired at least six shots at close range. [The plaintiff] did nothing to defend himself but raise his hands and sway from side to side to protect his face." Id. That the plaintiff was unarmed throughout the encounter was not disputed. Id. In considering the plaintiff's excessive force claim, the court found that there was a "clear break" in events between the use of force on the steps and what the court characterized as the officer's "execution style" shooting of the suspect on the ground. Id. at 507. The court denied the officer's motion to dismiss because, drawing all reasonable inferences in favor of the plaintiff, the plaintiff was "unarmed and this fact was apparent." Id.

Patterson contends that his alleged acts of surrender should serve as a clear break in the sequence of events. (See Doc. 115 ¶¶ 11-13.) The dashboard audio in this case is intermittent, and neither it nor the video permits a conclusion as to when shots

19

ended or their timing. (See Doc. 121-1.) Yet, Patterson does not allege that the officers stopped shooting at any time. The undisputed evidence is that the events transpired in serial fashion in a matter of seconds. While Brockington did not make a gap in shooting a requirement of an excessive force claim, see Brockington, 637 F.3d at 507 ("[T]here was a clear break in the sequence of events." (emphasis added)), it is clearly relevant that shots occurred in a successive and rapid sequence here. This is why courts are instructed to avoid second guessing "split-second" decisions made by officers in "tense, uncertain, and rapidly evolving" circumstances. Id. at 506-07. Accordingly, whether or not Patterson's purported surrender can serve as a "clear break" must be evaluated in light of the surrounding circumstances.

Patterson next relies on his claim that he was unarmed. But, to be sure, the issue is not whether he was in fact armed when he exited the vehicle but, instead, whether a reasonable officer could have thought he was armed or otherwise posed a threat under the circumstances. Anderson, 247 F.3d at 131; McLenagan v. Karnes, 27 F.3d 1002, 1007 (4th Cir. 1994). Where an officer has "sound reason" to believe that a suspect is armed, the officer can act reasonably by firing on the suspect "as a protective measure before directly observing a deadly weapon." Anderson, 247 F.3d at 131.

20

This was illustrated in <u>Sigman v. Town of Chapel Hill</u>, 161 F.3d 782 (4th Cir. 1998). There, police were called to a domestic dispute and told that Sigman was inside the house and out of control, had been laid off from his job, had consumed five to six beers, and had a knife. <u>Id.</u> at 784. Sigman threated to kill the responding officers, threw objects out a window at them, and reached through a broken window while swinging his knife at them. <u>Id.</u> 784-85. After an extended string of threatening behavior toward police, Sigman stepped out of the house and toward the officers. <u>Id.</u> at 785. Each officer claimed that Sigman had a knife in his right hand. <u>Id.</u> A crowd that had gathered across the street cheered for Sigman to continue. <u>Id.</u> Sigman then proceeded to advance further toward police. <u>Id.</u> Once he was ten to fifteen feet away from an officer, the officer "shot Sigman twice in rapid succession, mortally wounding him." <u>Id.</u> The officers had been trained that once an armed individual gets within twenty-one feet of the officer, the individual can stab and "fatally wound the officer even if the officer has his weapon brandished and is prepared to or has fired a shot." <u>Id.</u>

In a suit against the officers, Sigman's parents produced the affidavits of three witnesses who were located in a crowd across the street from Sigman's home. <u>Id.</u> at 785-86. The witnesses claimed that

Sigman came out of the house, with his hands raised;

21

> that they could clearly see . . . Sigman's hands and
> that he had nothing in them; that Sigman was intoxicated;
> that the officers shot Sigman three steps from the front
> door; and that based on their observations, . . . Sigman
> represented no threat of any kind to [the] officer and
> that the officer shot him for no reason.

Id. at 786 (internal quotation marks and citations omitted). In describing the affidavits, the court noted that the witnesses had been located by Plaintiffs' counsel and that each affidavit was identical and stated that the shooting took place on the wrong date. Id.

Although the court was faced with evidence of two versions of events, it found that, because the three witnesses "were located across the street amidst a crowd . . . [t]heir observations [could not] effectively impact the credibility of [the officer's] testimony . . . as to his perceptions of what he saw from an entirely different—and closer—vantage point." Id. at 787-88. The dissent warned that this analysis involved weighing credibility. Id. at 791 (Michael, J., dissenting). The Fourth Circuit conducted a similar analysis in Anderson. See Anderson, 247 F.3d at 131 ("[M]inor discrepancies in testimony do not create a material issue of fact in an excessive force claim, particularly when . . . the witness views the event from a worse vantage point than that of the officers.").

After dispatching the witnesses' affidavits, the Sigman court turned to the issue of whether it was reasonable for the

22

officer to use deadly force.  In doing so, the court weighed
heavily the fact that the officer had "ample knowledge of Sigman's
dangerousness," and knew him to have, at least recently, been
armed with a knife.  Sigman, 161 F.3d at 787.  The court thus
concluded:

> Where an officer is faced with a split-second decision
> in the context of a volatile atmosphere about how to
> restrain a suspect who is dangerous, who has been
> recently — and potentially still is — armed, and who is
> coming towards the officer despite officers' commands to
> halt, we conclude that the officer's decision to fire is
> not unreasonable.

Id. at 788.

Sigman is instructive for at least two reasons.  First, it
establishes that officers will be given substantial leeway where,
as here, the crime is serious, the circumstances are chaotic, and
the suspect is known to have been at least recently armed.
Second, it establishes that conflicting versions of events will
not necessarily result in a trial where the contradicting witness
had a worse vantage point than that of the officer.

Here, even under Patterson's version of events, the criminal
offense is much more serious than in Sigman.  Patterson and Majors
robbed a bank at gunpoint, led a harrowing car chase, shot at the
Defendant officers, struck Officer O'Hal with their vehicle,
continued firing at the officers, and shot O'Hal twice.  Under
these circumstances, a reasonable officer could continue to
perceive that Patterson posed a threat.  There are, however, some

23

factual distinctions.  First, Patterson claims he did not move toward the officers when he exited the vehicle.  (Doc. 115 ¶¶ 11-13.)  Second, he claims he raised his hands upon exiting the vehicle.  (Id. ¶ 12.)  Unlike the witnesses across the street in Sigman, Patterson was every bit as close to the action as the officers.  Thus, Patterson's affidavit cannot be discarded on the logic of Sigman and, as a result, the court must determine whether the chaotic circumstances and the officer's "ample knowledge" of Patterson's dangerousness made it reasonable to use deadly force even under Patterson's version of events.  Before turning to this issue, however, the court must first address several of the cases relied upon by Defendants.

Defendants cite Johnson v. Scott, 576 F.3d 658, 660 (7th Cir. 2009), Wylie v. Overby, No. 05-cv-71945, 2006 WL 1007643, at *8 (E.D. Mich. Apr. 14, 2006), and Alicea v. Thomas, No. 2:11cv445, 2014 WL 4311079, *6 (N.D. Ind. Sept. 2, 2014), for the proposition that officers can reasonably use force after an attempt to surrender.  These cases stand for the proposition that "[n]ot all surrenders are genuine, and the police are entitled to err on the side of caution when faced with an uncertain or threatening situation." Johnson, 576 F.3d at 659; see also Wylie, 2006 WL 1007643, at *9 ("[N]o reasonable officer would be expected to read [the suspect's] mind and instantly know that what had theretofore been [the suspect's] attitude of insolence, struggle

24

and fight had suddenly become cooperation, surrender and peace .
. . based only upon [the suspect's] turning and beginning to
raise his hands."); Alicea, 2014 WL 4311079, at *6 ("The
[suspect's] surrender did not establish that he was unarmed, and
he could easily have decided to take off again . . . or reach for
a weapon."). While these cases are helpful to Defendants, they
are not directly on point in that they do not involve the use of
deadly force. Johnson, 576 F.3d at 659-60 (police dog); Alicea,
2014 WL 4311079, at *2 (same); Wylie, 2006 WL 1007643, at *2
(taser).

The court now turns to the motions as they apply to each
Defendant.

### 1. Officers Randazzo, O'Hal, and Flynt

Patterson cannot identify which officers fired which shots,
but Randazzo, O'Hal, and Flynt establish in their declarations
that they fired at Patterson until he was on the ground.
Patterson's account breaks his gunshot wounds into a series of
events. He contends that he was shot in his left tibia while he
was standing, shot in his upper back, arm, and mid-torso while
he was on his knees, and shot in his thigh while on the ground.
(Doc. 115 ¶¶ 12-13.) Because deadly force may be reasonable at
one point in time, but unreasonable at another, the court will
consider the reasonableness of force on a shot-by-shot basis.
See Brockington, 637 F.3d at 507 ("[I]f events occur in a series

25

they may be analyzed as such."); <u>Ayala v. Wolfe</u>, No. 1:11cv624, 2012 WL 3644740, at *3-7 (M.D.N.C. Aug. 23, 2012).

### a. Shots Upon Exiting the Vehicle

Leading up to the first alleged shot to his left tibia, Patterson contends he exited his vehicle, raised his hands, yelled for the officers to stop shooting, and took two to five steps. (Doc. 115 ¶¶ 11-12.) Neither the officers nor Patterson establishes how long this sequence of events took, but the only reasonable conclusion is that it unfolded rapidly, in a matter of seconds. Prior to Patterson exiting the vehicle, Randazzo, O'Hal, and Flynt knew that Patterson was armed and that he had pinned O'Hal against his car. (Doc. 97 ¶¶ 6-7; Doc. 98 ¶¶ 6-8; Doc. 101 ¶¶ 6-8.) O'Hal had been shot twice (Doc. 98 ¶ 18), and Randazzo knew this (Doc 97 ¶ 6-7). Prior to exiting his vehicle, Patterson had shown an absolute unwillingness to surrender. He had fled in a high speed chase, swerved to avoid stop-sticks, and even continued to attempt to flee after striking O'Hal with his vehicle. In other words, the officers had no reason to expect Patterson to abruptly surrender.

Once Patterson's vehicle came to its final stop, the video shows that it was nearly parallel to the nearby tree line. (Doc. 121-1.) The rear of the vehicle, however, was slightly closer to the road and farther from the tree line than the front. (<u>Id.</u>) Patterson claims that as he exited his vehicle, gunfire was coming

26

from behind him. (Doc. 115 ¶ 11.) Collectively, the Defendant officers formed a semicircle around Patterson's vehicle. (<u>See</u> Doc. 121-1); <u>see also</u> <u>supra</u> Part I at 6-9. O'Hal and Randazzo claim that they were positioned behind and to the driver's side of Patterson's vehicle and engaged him during this time period. (Doc. 97 ¶ 7; Doc. 98 ¶ 7.) Flynt was to their right and was also engaging Patterson. (Doc. 101 ¶ 10.) When Patterson exited his vehicle, he claims that he took two to five steps. (Doc. 115 ¶ 12.) If Patterson had headed to his left, he would have headed toward O'Hal, Randazzo, and Flynt and into gunfire. (Doc. 121-1.) Upon exiting his vehicle, Patterson says he was too "terrified" to even look in this direction. (Doc. 115 ¶ 11.) Going to the right, however, was not an option because his car door would have been in the way. (<u>See</u> Doc. 121-1.) Instead, the only way Patterson could have headed away from gunfire — which formed a semicircle around his vehicle — and ended up on the ground facing away from Defendants in two to five steps is if he headed toward the nearby tree line. (<u>See</u> Doc. 115 ¶ 11-13; Doc. 121-1.) In addition, Patterson's movement toward the tree line is consistent with his being shot in the left tibia, as his left leg would have been facing in the direction of O'Hal, Randazzo, and Flynt.

Raising one's hands is a sign of surrender. But given the rapid sequence of events and the circumstances described above,

27

a reasonable officer could easily have been unclear of
Patterson's intentions for a matter of seconds. See Anderson, 247
F.3d at 131 ("[Officer] acted reasonably by firing on [suspect]
as a protective measure before directly observing a weapon.").
Even a clear sign of surrender takes at least a moment to process,
see Wylie, 2006 WL 1007643, at *9, and here Patterson's surrender
was less than clear given his movement toward the tree line. In
addition, the time needed to process an attempt to surrender
would be greater in this case given Patterson's violent efforts
to avoid capture immediately preceding his purported surrender.
Patterson had shown absolutely no willingness to surrender prior
to exiting his car. In addition, a reasonable officer could have
believed that Patterson still had his gun somewhere on his person.
See Sigman, 161 F.3d at 787-88. Accordingly, even under
Patterson's version of events, a reasonable officer could have
believed that he posed a serious threat of physical harm at the
time he was allegedly shot in the tibia. Having caused the
extensive violent encounter, Patterson cannot blame the officers
because it may have been more difficult for him to clearly and
spontaneously surrender or for the officers to understand that
he intended to immediately de-escalate the threat. O'Hal,
Randazzo, and Flynt will therefore be granted summary judgment
as to the first shot.

28

### b. Shots When Patterson Went to His Knees

Patterson claims he was next shot as he fell to his knees. At this point, and again assuming Patterson's version of events, the officers had only slightly more time to process Patterson's alleged attempt to surrender. Once again, neither side has presented helpful evidence of timing. However, Patterson's own account has him going to his knees as a result of the shot he sustained to his left tibia while standing. (Doc. 115 ¶ 12.) Patterson, thus, would have reached his knees as quickly as gravity would have taken him. (See id.) This could not have been more than a second or two. (See id.) Once on his knees, Patterson would no longer have been moving toward the tree line; however, he does not account for the location of his hands while he was on his knees. (See id.) Even under Patterson's version of events, and as noted above, a reasonable officer could have believed that Patterson's gun was somewhere on his person. Accordingly, given the chaotic scene, the inherently quick timing, and Patterson's prior actions, a reasonable officer could have believed that Patterson continued to pose a serious threat of physical harm while he was on his knees. See Sigman, 161 F.3d at 787-88. O'Hal, Randazzo, and Flynt will therefore be granted summary judgment as to the shots Patterson allegedly sustained while on his knees.

29

### c. Shot After Patterson Hit the Ground

The alleged shot after Patterson hit the ground presents a closer question. By this time, under Patterson's version of events, slightly more time had passed to process his alleged attempted surrender, and his account has him going to the ground, facing away from the officers, with his hands stretched out in front of him. (Doc. 115 ¶ 13.) Again, there is no specific evidence on timing; Patterson contends only that he had time to reflect upon his impending death prior to feeling the shot to his thigh. (Id.) Under any reasonable interpretation, however, the last shot came within seconds of the others.

The officers do not dispute Patterson's contention that his arms were extended once he was on the ground. In fact, O'Hal observed Patterson fall to the ground with his hands away from his body. (Doc. 98 ¶ 16 ("After Mr. Patterson went to the ground, his arm was extended away from his body and it did not appear that he was aiming the handgun in my direction, or at any other officers or civilians at the scene.").) Further, O'Hal, Randazzo, and Flynt concede that Patterson did not appear to pose a threat after he was completely down on the ground. (Doc. 97 ¶¶ 12-13; Doc. 98 ¶ 16; Doc. 101 ¶ 13.) The officers contend that they did not shoot or hear or see anyone else shoot after this moment. (See, e.g., Doc 97 ¶ 13.)

While a closer question, on this record the court concludes

30

that, even assuming Patterson's version of events that he was shot after falling to the ground, a reasonable officer could have continued to use deadly force against Patterson at the time of this alleged last shot. Patterson has not alleged facts supporting any significant gap in shooting, as in <u>Brockington</u>, and the record does not support such a determination. Rather, the reasonable inference is that the shots proceeded in nearly serial fashion as Patterson exited the vehicle until he lay on the ground and officers determined he no longer posed a threat. If Patterson attempted to surrender, his extensive violent conduct leading up to this point rendered it reasonable for Defendants to regard him as a continuing threat, either to them or as a fleeing, armed felon.

"[I]f police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." <u>Plumhoff v. Rickard</u>, 134 S. Ct. 2012, 2022 (2014).[7] More apt here are cases applying this rule, like <u>Dasho v. City of Fed. Way</u>, No. C12-1398JLR, 2015 WL 3796284 (W.D. Wash. June 17, 2015). There, police responding to a report of a fight at an apartment encountered Mr. Dasho, naked and running into a kitchen to grab

---

[7] Of course, this rule applies until there is a clear surrender. <u>Id.</u> at 2021-22 ("This would be a different case if . . . [plaintiff] had clearly given himself up. But that is not what happened.").

a knife. Id. at *2. Mr. Dasho ignored commands to stop and ran towards the officers with the knife raised above his head. Id. The officers fired thirteen times in the space of 1.5 to 3 seconds. Id. Mr. Dasho argued that he turned away from the officers who nevertheless "continued shooting him after he 'fell to the ground and was immobilized.'" Id. at *6. The officers disputed this and contended that they ceased firing when he hit the ground. Id. at *5. The court granted the officers summary judgment, citing Plumhoff and holding that, "when faced with a tense, uncertain, rapidly evolving, and dangerous situation such as the one that existed here, an officer may reasonably fire a volley of shots at a threatening suspect, even if some of those shots are fired as the suspect falls to or lies on the ground." Id. at *10.

Similarly, in Ayala, police responding to a report of an armed robbery of a restaurant encountered Gerardo Ayala walking nearby. 2012 WL 3644740, at *1. During a protective frisk, officers felt a handgun. Id. As an officer moved away and drew his service weapon, Ayala removed the gun from his waistband with his right hand. Id. When the officer saw the gun, he fired several times: the first hit Ayala's hand, knocking the gun to the ground; another bullet hit Ayala in the spine and paralyzed him; the last shot came "several seconds after the other shots" which occurred "in quick succession to each other." 2012 WL

3644740, at *2. Ayala contended that the last shot occurred while he was on the ground and after a "clear break." Id. at *6. The officer contended that he did not shoot after he saw Ayala fall to the ground. Id. The district court held that even if Ayala's testimony were sufficient to establish that the last shot occurred while he was on the ground and after "four to five seconds," it was insufficient to establish that it occurred after a "clear break." Id. Moreover, the court held that, even assuming Ayala's version of events, the evidence did not show that the officer knew before he fired the last shot that "the danger to him had clearly and unmistakably passed." Id. at *7. The court concluded that "[t]he Constitution simply does not require police to gamble with their lives in the face of a serious threat of harm." Id. (quoting Elliott, 99 F.3d at 641).

Other cases have similarly held that officers acted reasonably in continuing to shoot an armed (or believed to be armed) suspect after falling to the ground until the threat had unmistakably abated. See, e.g., Webb, 761 F. Supp. 2d at 392 (finding officer acted reasonably in shooting suspect from obstructed view after suspect fell to the ground because he was "acting to ensure the neutrality of a deadly threat"); Maradiaga v. Wilson, 518 F. Supp. 2d 760, 775-76 (D.S.C. 2007) (granting summary judgment for officers where plaintiff was shot seven times, including once while lying on the ground allegedly "for

33

no lawful reason" where facts showed that a reasonable officer would not have concluded that the threat had abated); Berube v. Conley, 506 F.3d 79, 85 (1st Cir. 2007) (finding officers acted reasonably in continuing to shoot hammer-wielding suspect shortly after he fell to the ground because the officer "made a split-second judgment in responding to an imminent threat and fired a fusillade in an emergency situation").

Here, in light of the immediately preceding events that included Patterson's deadly resistance with a gun fight, the officers had sound reason to have believed that he continued to pose a threat as he exited the car and until he was unmistakably subdued after he lay on the ground. Therefore, summary judgment will be granted to O'Hal, Randazzo, and Flynt on Patterson's Fourth Amendment claim.

### 2. Officers Wrenn, Jones, Cranford, and Bennett

While Patterson cannot identify which officer shot him at what time, the undisputed facts show that the shot Patterson allegedly sustained while on the ground could not have come from Cranford, Bennett, Wrenn, or Jones. Cranford and Bennett contend that they were positioned on the passenger side of Patterson's vehicle and that they stopped firing once Patterson exited the vehicle because they could no longer see him. (Doc. 100 ¶ 10; Doc. 102 ¶ 9.) Wrenn concedes that he fired at least two shots after Patterson exited the vehicle. (Doc. 103 ¶ 11.) However,

34

Wrenn contends that he did not shoot after Patterson went to the ground because Patterson was no longer visible to him. (Id. ¶ 12.) Patterson does not dispute any of this evidence.

Patterson specifically contends that Jones was involved in the terminal moments of the encounter. (Doc. 120 at 15.) In Wrenn's dashboard video, Jones can be heard to say that once Patterson "c[a]me up" he shot at him.[8] (See Doc. 121-1.) However, Jones contends that he was located on the front passenger side of Patterson's vehicle and that he did not fire once Patterson exited his vehicle, as Patterson was no longer visible to him. (Doc. 99 ¶ 10.) The video shows that, if Patterson's version of events is true, his vehicle would have been between Jones and Patterson when he was allegedly shot on the ground. (See Doc. 121-1; Doc. 99 ¶ 10; Doc. 115 ¶¶ 11-13.) It is, therefore, not possible that Jones fired the shot that struck Patterson's thigh.

The undisputed facts thus establish that Cranford, Wrenn, Bennett, and Jones could not have fired the alleged shot that hit Patterson while he was on the ground. Therefore, and for the reasons stated above, Defendant's motion to dismiss will be granted as to those officers.

---

[8] Patterson has submitted a document that purports to be a summary (at times a transcript) of the events portrayed in the dashboard video. (Doc. 30.) It is inadmissible hearsay, and the video is already submitted in evidence and is the best evidence of its contents. Fed R. Evid. 802; Fed. R. Evid. 1002; Buruca v. District of Columbia, 902 F. Supp. 2d 75, 82-83 (D.D.C. 2012).

### E.  Qualified Immunity

Even if O'Hal, Randazzo, and Flynt acted unreasonably, they may nevertheless be entitled to summary judgment on the grounds of qualified immunity.  Qualified immunity is designed to save officers from the expense of trial where their actions were mistaken but nevertheless reasonable.  Hunter v. Bryant, 502 U.S. 224, 227-28 (1991).  The doctrine acknowledges that

> [i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.  An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances.  If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

Saucier v. Katz, 533 U.S. 194, 205 (2001).

Officers are entitled to qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. 223, 231 (2009).  A violation of a clearly established statutory or constitutional right will not exist unless "existing precedent placed the conclusion that [the officer] acted unreasonably in the[] circumstances beyond debate."  Mullenix v. Luna, 136 S. Ct. 305, 308 (2015).  Accordingly, officers are entitled to qualified immunity unless this court can "say that only someone 'plainly incompetent' or who 'knowingly violate[s] the law' would have

36

perceived a sufficient threat and acted as [the officers] did."
Id. at 310 (some alterations in original).

At the time force was used in this case, the Fourth Circuit
had decided Brockington, where it established that "it is just
common sense that continuing to shoot someone who is already
incapacitated is not justified." 637 F.3d at 508. Thus, only
someone plainly incompetent or who knowingly violates the law
would believe they are entitled to shoot someone who had clearly
surrendered. The real question is whether the facts make clear
that the suspect had clearly surrendered and was incapacitated.
In this regard, Brockington is distinguishable in that there was
such a clear break in the sequence of events and the suspect was
immobilized on his back that the officer's action was
characterized as an "execution style" shooting. Id. at 507.

Here, for the reasons already explained, even assuming
Patterson's version of the facts, it is difficult for him to
claim that officers should have immediately recognized his
purported attempt to surrender when he exited the vehicle, given
the immediately preceding firefight and deadly resistance to
arrest. Patterson does not claim that his exit was preceded by
any announced intent to surrender, and his version of events
necessarily has him moving toward the tree line. Given the
inherently rapid timing and the direction of Patterson's
movement, a reasonable officer could have believed he was not

37

violating Patterson's clearly established constitutional rights under the circumstances the officers were facing. Put another way, this is very different from <u>Brockington</u>, and the officers would not have to be "plainly incompetent" or "knowingly violate the law" to perceive Patterson as a continuing threat during those events. <u>See</u> <u>City and County of San Francisco v. Sheehan</u>, 135 S. Ct. 1765, 1771 & n.2, 1775 (2015) (finding that officers had qualified immunity in shooting several times a mentally ill woman wielding a knife who threatened to kill the officers, noting that while there was a dispute whether the woman was on the ground for the last shot, "[t]his dispute is not material: 'Even if [the woman] was on the ground, she was certainly not subdued'" (citations omitted)); <u>Ayala</u>, 2012 WL 3644740, at *7 (granting summary judgment to officer who allegedly shot suspect after he went to the ground unarmed on alternate ground of qualified immunity).

Accordingly, Randazzo, O'Hal, and Flynt are entitled to summary judgment on the alternative basis of qualified immunity.

## III. CONCLUSION

Patterson and his accomplice engaged in an armed bank robbery and violent high speed chase to elude police, during which gunfire was exchanged. A reasonable officer could have viewed Patterson as a continuing deadly threat when each alleged

38

shot was fired. Therefore, Defendants' motion for summary judgment will be granted as to all Defendants.

IT IS THEREFORE ORDERED that the Magistrate Judge's Recommendation is ADOPTED but as modified by this Memorandum Opinion, that Defendants' motion for summary judgment (Doc. 95) is GRANTED, Defendants' motion to dismiss (Doc. 82) is DENIED as moot, and Patterson's claims are DISMISSED WITH PREJUDICE.

A judgment in accordance with this Memorandum Opinion and Order will be entered simultaneously.


<u>    /s/    Thomas D. Schroeder</u>
United States District Judge

February 4, 2016